OPINION
{¶ 1} Defendant-appellant Reginald Carter appeals from his conviction and sentence, following a no-contest plea, for Possession of Crack Cocaine. Carter contends that the trial court erred by denying his motion to suppress evidence that he claimed to have been obtained as the result of an unlawful search and seizure. Carter contends that when he was stopped, the police officer lacked reasonable and articulable suspicion for the stop. Carter contends that he was stopped when the police officer illuminated the parked automobile that Carter then occupied with spotlights on top of the officer's cruiser.
 {¶ 2} We agree with the State that a stop did not occur until the police officers got out of their cruiser, walked up to the parked car that Carter was occupying, and ordered him out of the car for a pat-down search for weapons. Based upon the evidence in the record, we conclude that the police officers had a reasonable and articulable suspicion at that time justifying the limited pat-down search for weapons. The tactile experience of the officer conducting the pat-down search, combined with his previous training and experience, gave that officer probable cause to believe that Carter was carrying crack cocaine upon his person. When this substance was seized, and field-tested positive for cocaine, there was probable cause for Carter's arrest, and the inventory search of his automobile, which was going to be towed, and the search of Carter's person upon being booked in at the jail, were justified. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} Dayton police officer Doug Hall, a narcotics investigation detective, and his partner, Rodney Barrett, were patrolling in a marked cruiser one evening in early December, 2002. At about 8:00 p.m., they first noticed the automobile that Carter was occupying, a grey Chevrolet Caprice, with its motor running and parking lights on, in the middle of a parking lot of a carry-out, convenience store in an area described by Hall as a high-drug, high-crime area. Hall acknowledged that nothing at this time caused him to be suspicious.
 {¶ 4} Hall and Barrett continued to the next intersection, turned their cruiser around, and waited for about fifteen minutes, monitoring the parking lot of the convenience store. They noticed that there was only one occupant of the Caprice, later determined to be Carter, behind the driver's seat, and that he had no interaction with anyone during this time.
 {¶ 5} Hall admitted that he had no reasonable suspicion of criminal activity at this point, but he decided to conduct a field interview with Carter. To that end, Hall drove to the convenience store parking lot, passed the Caprice, turned around and parked behind the Caprice, "as if we're conducting a normal traffic stop." However, Hall did not stop Carter, whose vehicle was already parked, with its front end pointing to the exit from the parking lot to the city street. The police cruiser was behind Carter's car at this time.
 {¶ 6} Before approaching Carter to conduct the field interview, Hall "hit our take down lights which are the white lights that illuminate to the front of the vehicle, just to better illuminate the Caprice."
 {¶ 7} Hall acknowledged that if Carter had then left the scene, Hall and his partner "possibly could have" conducted a traffic stop because ". . . it's now aroused our suspicion even more. He sees the police now he wants to leave the area immediately after not wanting to leave after fifteen minutes that we've observed him sit there."
 {¶ 8} In any event, Carter did not leave the scene. Instead, Carter "first leaned over down to his right then he sat back up and he actually raised up off the driver's seat and leaned more towards his left. I could see his top of his shoulder, and his arm moving in an up and down motion like he was . . . [this response was never completed]." Hall testified that "as we were approaching the vehicle he again leaned down and towards his right, towards the front passenger area of the car."
 {¶ 9} Hall explained that these movements caused him concern:
 {¶ 10} "[Due] to my prior experience if — with that area of recovering guns off of people and also out of vehicles, I was concerned both for myself and for my partner that he may be attempting [to] arm himself or conceal a weapon at some point to launch an attack against us."
 {¶ 11} Hall testified that he was also concerned for the safety of the customers of the carry-out. For this reason, Hall had Carter step out of his car and submit to a pat-down search for weapons. During this search, when Hall "got below the belt line in the back in the tailbone buttocks area," Hall "just came up with my hand kinda, I guess it would be parallel to his legs and my hand hit a spherical, hard round lump."
 {¶ 12} Hall testified that he had conducted "maybe a couple thousand" pat-down searches during his career, that he has felt crack cocaine during some of those pat-down searches, and that he "could feel that there's numerous hard rock like pieces in there and from my training experience I believed it to be crack cocaine."
 {¶ 13} Hall retrieved the substance from Carter's person, and arrested Carter. The substance was field-tested, and tested positive for cocaine. Because his vehicle was going to be towed, and Carter said nothing about wanting to arrange for someone else to secure it, an inventory search was conducted, which led to the discovery of additional contraband Furthermore, when Carter was booked in at the county jail, additional crack cocaine and a bag of marijuana were found upon his person.
 {¶ 14} Carter was indicted for Possession of Criminal Tools, Possession of Crack Cocaine, Possession of Heroin, and Possession of Cocaine other than Crack Cocaine. Carter moved to suppress the evidence, contending that it was obtained as the result of an unlawful search and seizure. Following a hearing on the motion, his motion was denied. Thereafter, Carter pled no contest to one count of Possession of Crack Cocaine, and the State dismissed all the other counts. Carter was sentenced accordingly.
 {¶ 15} From his conviction and sentence, Carter appeals.
 II {¶ 16} Carter's sole assignment of error is as follows:
 {¶ 17} "The trial court erred in overruling the motion to suppress."
 {¶ 18} The essential disagreement between Carter and the State is when Carter was stopped. Carter contends that he was stopped as soon as Hall turned the cruiser's spotlight on to illuminate Carter's automobile. Carter argues, correctly, that Hall admitted in his testimony that he had no reasonable basis for stopping Carter at that time.
 {¶ 19} The State argues that Hall's act of illuminating Carter's automobile with his cruiser's spotlights did not constitute a stop, citing State v. Schwab (January 29, 2001), Clermont App. No. CA2000-07-055. That case is similar, in that a police officer shined his police cruiser's spotlight upon a vehicle, illuminating two individuals in the car. The police officer then approached the vehicle. The Twelfth District Court of Appeals held that these actions did not constitute a seizure. "The facts of this case show that the officer shined the spotlight into the car, parked in an angle behind the vehicle, and began to approach. Nothing in these actions constitutes a show of authority or constitutes a use of physical force. As noted above, approaching the occupants of a parked car to ask questions does not constitute a seizure. The fact that the officer shined the spotlight into the car does not change the analysis, nor does the fact that the officer parked at an angle behind the vehicle." Id., at 3.
 {¶ 20} We agree. Hall was entitled to approach Carter for the purpose of conducting a field interview. The fact that Hall might have stopped Carter upon Carter's then attempting to leave the parking lot is of no more significance than Hall's having intended to shoot Carter in this circumstance, as long as that possibility or intention was not communicated to Carter. From Carter's point of view, two police officers were simply approaching his vehicle, evidently desiring to speak to him. The fact that they used the cruiser spotlight to illuminate the vehicle before doing so did not constitute a show of force or authority sufficient to make this encounter a stop.
 {¶ 21} It is widely recognized that the use of the red and blue flashing lights on top of a police cruiser is a signal to stop, which would be properly interpreted as a command However, the use of other lights to illuminate a vehicle, prior to approaching it, does not constitute a command to stop.
 {¶ 22} Carter does not argue that the police officers were without reasonable and articulable suspicion to conduct a pat-down search, based upon the movements observed when Carter's vehicle was illuminated. We agree with the State that the police officers had at least as much of a basis for a stop under the circumstances in this case as police officers did in State v.Bobo (1988), 37 Ohio St.3d 177.
 {¶ 23} Furthermore, Carter does not argue that the police were without probable cause to seize the object felt during the pat-down, and we conclude that Hall did have probable cause, based upon his testimony concerning what he was feeling, together with his training and experience. Likewise, Carter does not challenge the inventory search of the automobile, or the search of his person when he was booked in at the county jail, having contended instead that the original stop was unlawful.
 {¶ 24} Carter's sole assignment of error is overruled.
 III {¶ 25} Carter's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
Grady and Young, JJ., concur.