OPINION
{¶ 1} Plaintiff-appellant, the State of Ohio, appeals from the judgment of the Franklin County Court of Common Pleas, whereby the trial court granted a motion to suppress evidence in favor of defendant-appellee, Lawrence J. Carrocce.
 {¶ 2} The Franklin County Grand Jury indicted appellee on two counts of carrying a concealed weapon, fourth degree felonies, in violation of R.C. 2923.12, two [D1] counts of improperly handling firearms in a motor vehicle, fourth degree felonies, in violation of R.C. 2923.16, and one count of unlawful possession of a dangerous ordnance with a firearm specification, a fifth degree felony, in violation of R.C. 2923.17 and2941.144, respectively. The charges pertained to law enforcement finding firearms and ammunition in appellee's van during an investigation into whether appellee was engaging in drug activity.
 {¶ 3} Appellee filed a motion to suppress evidence stemming from law enforcement's investigation, and the trial court held a hearing on the matter. At the hearing, Columbus Police Officer Matthew Freetage testified to the following on appellant's behalf. During the evening of February 24, 2005, an individual called the Columbus Police Department's "radio room" and "said that there was a male in [a] parking lot in a white van possibly dealing drugs." (Tr. at 7.) As a result, the "radio room" dispatched the information to officers on patrol. The dispatch identified the caller as "Josh" and noted the caller's phone number. (Tr. at 19.)
 {¶ 4} Officer Freetage responded to the dispatch at about 10:00 p.m. He drove to a parking lot next to a vacant warehouse building and saw a "white cream-colored van, like an armored vehicle" with "thick windows" parked in the lot. (Tr. at 6.) The parking lot was dark and the street lights were "off and on throughout the night." (Tr. at 6.) There were no other cars parked "in close proximity" to the van and "on the other side of [the] street was [a] Big Lots [department store] parking lot[.]" (Tr. at 6-7.)
 {¶ 5} Officer Freetage parked his cruiser behind the van. Officer Freetage activated the "red and blue beacons on" his cruiser, and put a "spotlight on the [van], so [he] could see it better." (Tr. at 7.) Appellee was inside the van "behind the passenger's seat facing the passenger's side out of the window." (Tr. at 7.) Officer Freetage spoke with appellee through the window. The officer explained why he was there, and appellee stated that he was "conducting business" by "cashing checks" from Big Lots employees. (Tr. at 8.) Appellee had no customers at the time, but "told [Officer Freetage] to leave so he could conduct his business." (Tr. at 8.) Officer Freetage requested that appellee show some identification, but appellee refused. Officer Freetage asked appellee several times to exit the van, but appellee refused. Rather, appellee "kept wanting to argue about how he didn't need to show * * * an ID, and I need to get out of there so he could conduct his business." (Tr. at 9.)
 {¶ 6} Officer Freetage called for police assistance, and Columbus Police Officers Eric Clouse and Andrew Rogerson arrived. Appellee called 911. The person answering the 911 call told appellee that police were with him. However, appellee hung up and called 911 again. Officer Freetage "told him he couldn't keep calling 911. The police were already there." (Tr. at 10.) Appellee then stated that "he wanted Franklin County Police to show up" because "we weren't the real police." (Tr. at 10.) When a Franklin Township police officer arrived, appellee "said he knew that officer[,]" and appellee exited his van. Yet, appellee called 911 again, and officers arrested him. (Tr. at 10.)
 {¶ 7} While searching the immediate area, officers noticed a "pistol in the center consul" near where appellee had been sitting. (Tr. at 12.) Additionally, a drug dog had arrived, sniffed the van's exterior and indicated a detection of drugs in the van. "After the dog hit on the vehicle," officers searched the van and found "four 30 rounds of magazines of ammunition under the driver's seat." (Tr. at 12.) Officers also found a firearm "laying in the back behind * * * the driver's seat[.]" (Tr. at 12.) In addition, "[t]here was a lot of money in the van" and appellee "had some checks in the van." (Tr. at 14.)
 {¶ 8} In reflecting on appellee's conduct, Officer Freetage next testified that:
 * * * ["Josh"] could have been right. There could have been something going on, be it drug related or whatever. The caller left his name saying, Hey, I think there is a drug transaction going on.
 After seeing the money through the window, after [appellee] wouldn't get out of the vehicle, it was possible there was a drug transaction occurring.
(Tr. at 17-18.)
 {¶ 9} On cross-examination, Officer Freetage testified to the following. Officer Freetage approached appellee in the parking lot to investigate the report of possible drug activity. Appellee was not free to leave the scene when Officer Freetage approached him. Officer Freetage did not observe appellee break any laws when he first saw appellee, and appellee was "lawfully parked[.]" (Tr. at 20.) In addition, appellee was under no legal duty to have produced identification for Officer Freetage. Moreover, officers found no drugs in appellee's van. Indeed, Officer Freetage witnessed no drug transactions involving appellee, and saw no "drug people loitering in the area[.]" (Tr. at 21-22.) Moreover, Officer Freetage noticed that the van was "armored" "such as one might use to house money for a check cashing business[.]" (Tr. at 32.) Lastly, Officer Freetage verified that appellee had made at least four 911 calls and that officers arrested appellee for misusing 911 and obstructing official business.
 {¶ 10} On re-direct examination, Officer Freetage stated that he did not notice any postings on the van's windows. The officer also noted that, because appellee had "major health problems[,]" the county jail would not accept him, and he was released. (Tr. at 35.) Thus, according to Officer Freetage, the officers searched "the driver's seat" of appellee's van for weapons to ensure that appellee "wouldn't get back out and be able to shoot or stab somebody or hurt another officer." (Tr. at 35.)
 {¶ 11} On re-cross examination, Officer Freetage admitted that he told appellee that he would "smoke [appellee] out of the van" by using chemical mace if appellee did not exit the van. (Tr. at 38.) Officer Freetage also admitted that he "threatened to gas" appellee if appellee did not exit the van. (Tr. at 38.)
 {¶ 12} As noted, Officer Clouse responded to Officer Freetage's call for help, and Officer Clouse testified to the following on appellant's behalf. Upon arriving to assist Officer Freetage, Officer Clouse noticed Officer Freetage "at the little service window on the side of the van" speaking to appellee. (Tr. at 42.) Officer Rogerson, who also responded to Officer Freetage's call for help, was also talking to appellee. Appellee stated: "You are not the real police[,]" and the officers responded: "We're the real police." (Tr. at 42-43.) Appellee called 911 and, ultimately, a Franklin Township police officer arrived. Officer Clouse thought that "maybe [appellee] thinks this isn't Columbus jurisdiction. He might think this is Franklin Township[.]" (Tr. at 43.)
 {¶ 13} Eventually, appellee opened the side door of the van, and the officers grabbed his arm and removed him from the vehicle. At that time, Officer Clouse saw a "banana clip with a magazine for an automatic machine gun sitting on the floor behind the seat that [appellee] was seated in just right there on the floor in plain view." (Tr. at 44.) Thereafter, officers searched appellee's van and found a firearm "near the center consul of the van" and a firearm under a mattress in the van. (Tr. at 45.) Officers also found checks and approximately $50,000 in cash. Officer Clouse stated that the search of the van "had fallen under the realm of the protective sweep of the vehicle, and [because] there was also ammunition in plain view of us as soon as that door opened." (Tr. at 46.) On cross-examination, Officer Clouse stated that it was possible that officers used appellee's keys to open a van door before entering the van.
 {¶ 14} As noted, Officer Rogerson also responded to Officer Freetage's call for help, and Officer Rogerson testified to the following on appellant's behalf. Upon arriving to assist Officer Freetage, Officer Rogerson noticed that Officer Freetage was at the "passenger side window behind the driver's window." (Tr. at 52.) Appellee was refusing to exit his van pursuant to Officer Freetage's orders, and appellee called 911 approximately two or three times. Eventually, appellee exited the van when a Franklin Township police officer arrived; appellee stated that he knew the Franklin Township police officer. Officers then arrested appellee, and "did an immediate search of the immediate accessible area for any kind of weapons." (Tr. at 53.) Officers found a very large amount of cash and several magazines of ammunition. Officers also found a firearm "in the consul" and a firearm under a "mattress * * * to the left and the rear where [appellee] was sitting in his chair at the side window[.]" (Tr. at 53-54.)
 {¶ 15} Next, appellee testified to the following on his own behalf. Appellee's van contained, on one of its windows, a sign that identified the cost of "cashing checks[.]" (Tr. at 56.) Appellee is not a drug dealer, rather, appellee cashes payroll checks for Big Lots employees. Appellee provides the service for employees leaving work between 8:00 p.m. and 1:00 a.m. During the evening of February 24, 2005, appellee had $50,000 in cash in his van to conduct the check cashing business. That evening:
 * * * [A] vehicle pulled up behind [appellee's] van and put floodlights into [the] back window, and then a person [confirmed at trial to be Officer Freetage] walked to the driver's door, found out [appellee] wasn't sitting in the driver's door and came around to the passenger's side where the teller's window is, immediately grabbed the passenger door and said, How do you open this door?
 [Appellee] said, You don't open that door. This is an armored vehicle, and we do not open doors on this vehicle.
(Tr. at 57.)
 {¶ 16} Next, Officer Freetage ordered appellee to exit the vehicle, and appellee refused. Officer Freetage asked appellee to provide identification, and appellee reached for his wallet to obtain the identification. However, Officer Freetage then told appellee to "[k]eep [his] hands where [the officer could] see them" and "[t]his eliminated any further talk about" appellee's identification. (Tr. at 58.) Officer Freetage asked appellee what he was doing, and appellee stated that he was cashing paychecks for employees of a Big Lots located across the street. Appellee was sitting in front of the "teller's box" with "cash drawers[,]" and appellee "had eight Big Lots checks at that time * * * and [appellee] fanned them open to [Officer Freetage] so he could read the name 'Big Lots' on it." (Tr. at 58-59.) Officer Freetage was "standing right on the other side of the window and the cash drawer * * *. From that point [Officer Freetage] just immediately lost his temper * * * and said, If you don't get out of the vehicle, I'm [going] to knock this window in and I'm going to gas you out." (Tr. at 59.) Thus, appellee called 911 because he "was very scared." (Tr. at 59.) Appellee stated to the 911 operator that "I have got an irate person at the window. He is not acting to me like any CPO * * * I had seen." (Tr. at 59.) The 911 operator stated that "[t]here [are] other cruisers on the way, and you need to exit the vehicle." (Tr. at 60.) Appellee exited his van and, upon doing so, immediately closed the van door "[b]ecause every time the doors closed, they automatically locked." (Tr. at 60.) After appellee exited the van, officers searched appellee's pockets, obtained appellee's keys from his pockets, and unlocked the van with the keys.
 {¶ 17} On cross-examination, appellee admitted that he saw Officer Freetage was in a police uniform and that the other officers that arrived were also in police uniform. Appellee also testified that he called 911 twice, or that it "might have been only once" and "[w]e may have got disconnected, and I called them back." (Tr. at 63.) Appellee further testified that officers did not tell him not to call 911 and did not indicate that if he called 911 he would be arrested. Next, appellee stated that Officer Freetage told appellee to exit the van five or six times. However, appellee testified that he did not exit the van because he had approximately $50,000 in cash in the van and that he "saw no reason to open the door to a stranger wearing a gun, telling [him] to get out." (Tr. at 64.) Lastly, appellee testified that the Franklin Township police officer verified to the other officers that evening that appellee "is here every week cashing checks. I know who he is. We see him all the time." (Tr. at 66.)
 {¶ 18} Subsequently, appellee's trial counsel informed the court that the misuse of 911 and obstruction of official business charges "were never turned in, never assigned a judge[.]" (Tr. at 68.) Thereafter, the trial court granted appellee's motion to suppress. The trial court made oral findings, concluding that officers violated appellee's constitutional rights against unreasonable searches and seizures. The trial court noted that the informant who called about appellee's possible drug activity "wasn't somebody known to the officer or to the dispatcher, and, basically, somebody should have called the individual and verified" the tip. (Tr. at 72.) The trial court also stated that:
 * * * [Officer Freetage's] testimony, basically, it was [appellee] could have been dealing drugs. He had a lot of money. He could have been dealing in drugs. No question about it. But that's not the standard that I'm allowed to go by. There has to be reasonable probable cause, he was, in fact, committing some type of illegal drug activity.
 In this case, what the discovery was afterwards, he was doing exactly what he said he was doing, and that was, cashing checks for Big Lots. He was in the parking lot. He was in Big Lots. He had the cash checking sign. * * *
(Tr. at 73-74.)
 {¶ 19} However, the trial court did admonish appellee, "[t]here was a better way for you to handle it. * * * I don't buy this attitude that you * * * didn't know they were Columbus Police Officers, and I think you knew who they were, and the Court doesn't appreciate your conduct. * * * It was because of your bad conduct, in my estimation, that the officers went as far as they did." (Tr. at 74-75.)
 {¶ 20} Yet, the trial court concluded, "because of the circumstances, the law doesn't allow me to say that there was reasonable cause to order him out and to search his vehicle." (Tr. at 75.) Similarly, the trial court stated that, even concluding that "the ordering out was okay[,]" "the search was not [reasonable] and the evidence is suppressed." (Tr. at 75, 78.)
 {¶ 21} Thereafter, the trial court issued a judgment entry that journalized its findings of fact and conclusions of law regarding its decision to grant appellee's motion to suppress. In the judgment entry, the trial court stated that, "[o]n February 24, 2005, at approximately 10:12 p.m., police officers were dispatched * * * after a caller reported a male in a white van possibly selling drugs[.]" The trial court also found that, "[w]hile the caller was not specifically identified to the officer responding to the call, the caller did leave a phone number and his name with the dispatcher." Next, the trial court concluded that appellee "was unlawfully detained" and that "the officers did not have an articulable reasonable suspicion to justify the action that they took." Such action included: (1) Officer Freetage ordering appellee out of his van; (2) officers searching appellee's van after "a police dog with extensive training in narcotics detection" indicated an odor of drugs in appellee's van; and (3) officers performing "a protective search" inside appellee's van.
 {¶ 22} In its decision, the trial court noted that "[a]ll Columbus police officers, and especially the officer arriving first on the scene, testified, and the Court so finds, that [appellee] was committing no violations of law at the time." The trial court also stated that, when Officer Freetage asked appellee about his business, appellee "stated that he was cashing checks for Big Lots" and "his proof of this was a large pile of cash which was revealed to [the] officers, and, there was also a schedule of costs for check cashing * * * [that] was clearly visible to the police officers." The trial court also found that appellee:
 * * * [D]id call 911 on at least two occasions, however, the 911 operator advised him to get out of the van and that the officers were, in fact, Columbus police officers. Once [appellee] understood this, he did get out of the van, although he did ask the officers to contact Franklin Township police officers, because the Franklin Township officers could verify his business at that location. * * *
 {¶ 23} Next, the trial court concluded that the informant who called 911 about appellee's possible drug activity relayed an "anonymous" tip and that the informant's "reliability was not tested in any way." Rather, the trial court stated that "[a]ll indications were that [appellee] was, in fact, cashing checks." The trial court then concluded that the officers "could have waited and observed to see if there was any suspicious activity around the van, such as that indicated by the anonymous caller; they could have checked with the management at Big Lots; or as [appellee] had indicated to them they could have checked with the Franklin Township police." Lastly, the trial court concluded that "[t]he ultimate arrest, in this Court's opinion was more than likely a result of the acrimonious verbal exchange between the officers and [appellee]."
 {¶ 24} Appellant appeals, raising one assignment of error:
 THE TRIAL COURT ERRED WHEN IT GRANTED DEFENDANT'S MOTION TO SUPPRESS.
 {¶ 25} In its single assignment of error, appellant contends that the trial court erred by granting appellee's motion to suppress. We agree.
 {¶ 26} In a motion to suppress, the trial court assumes the role of the trier of fact and, thus, resolves questions of fact and evaluates witness credibility. State v. Burnside, 100 Ohio St.3d 152,2003-Ohio-5372, at ¶ 8. As such, we accept the trial court's findings of fact if they are supported by competent, credible evidence. Id. However, we independently determine as a matter of law whether the facts meet the appropriate legal standard. Id. In this regard, we apply de novo review to the trial court's application of the law to the findings of fact.State v. Zax-Harris, 166 Ohio App.3d 501, 2006-Ohio-1855, at ¶ 8.
 {¶ 27} Appellee's motion to suppress evokes search and seizure issues governed by the Fourth Amendment to the United States Constitution, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" Searches and seizures conducted without a warrant are per se unreasonable unless they come within one of the " 'few specifically established and well delineated exceptions.' " Minnesota v.Dickerson (1993), 508 U.S. 366, 372, quoting Thompson v. Louisiana
(1984), 469 U.S. 17, 20. Evidence is inadmissible if it stems from an unconstitutional search or seizure. Wong Sun v. United States (1963),371 U.S. 471, 484-485.
 {¶ 28} An investigative stop, or Terry stop, is a common exception to the Fourth Amendment warrant requirement. Terry v. Ohio (1968),392 U.S. 1, 20-22, 30-31. A Fourth Amendment seizure, which includes aTerry stop, occurs when, in view of all the surrounding circumstances, a "reasonable person" would have believed that "he was not free to leave."United States v. Mendenhall (1980), 446 U.S. 544, 554. Here, although Officer Freetage encountered appellee while appellee was parked, we conclude that, pursuant to Mendenhall, Officer Freetage initiated an investigative Terry stop on appellee because a "reasonable person" in appellee's position would have believed that "he was not free to leave." As an example, Officer Freetage activated the red and blue beacons on his cruiser when he approached appellee. Such conduct signaled appellee's need to comply with Officer Freetage's authority, given that "[i]t is widely recognized that the use of the red and blue flashing lights on top of a police cruiser is a signal to stop, which would be properly interpreted as a command." State v. Carter, Montgomery App. No. 19833, 2004-Ohio-454, at ¶ 21. Here, Officer Freetage acknowledged that appellee was not free to leave once he pulled up behind the van and put on the cruiser's lights. (Tr. at 29.) We further recognize that: (1) Officer Freetage did not end the encounter despite appellee indicating that he did not want to talk with the officer and that he wanted the officer to leave; (2) Officer Freetage threatened to use chemical devices to force appellee out of the van; (3) other law enforcement officers arrived to provide assistance to Officer Freetage; and (4) 911 operators confirmed to appellee that he "need[ed] to exit" his van, i.e., comply with Officer Freetage's orders. (Tr. at 60.)
 {¶ 29} An officer may conduct an investigative Terry stop on an individual if the officer has a reasonable suspicion, based upon specific and articulable facts, that criminal behavior has occurred or is imminent. Terry at 20, 21, 30, 31; but, see, United States v.Arvizu (2002), 534 U.S. 266, 274 (stating that an officer's reliance on a mere " 'hunch' " is insufficient to justify a Terry stop). Here, Officer Freetage initiated the investigative stop largely in response to a police dispatch regarding an informant who indicated that "there was a male in [a] parking lot in a white van possibly dealing drugs." (Tr. at 7.)
 {¶ 30} The constitutionality of an investigative stop based on a police dispatch does not depend upon whether law enforcement officers relying upon the dispatch were aware of the specific facts that led to the dispatch. Id.; Maumee v. Weisner (1999), 87 Ohio St.3d 295, 297. Rather, we look to whether those who issued the dispatch possessed reasonable suspicion. United States v. Hensley (1985), 469 U.S. 221,231; Weisner at 297. If the dispatch was issued in absence of reasonable suspicion, "then a stop in the objective reliance upon" the dispatch "violates the Fourth Amendment." Hensley at 232; Weisner at 297.
 {¶ 31} Here, the dispatch concerning appellee was issued based on a tip from an informant. Thus, we must examine the "weight and reliability due" the informant's tip. Weisner at 299. The informant's veracity, reliability, and basis of knowledge are highly relevant factors in determining the value of the informant's tip. Id.
 {¶ 32} In examining the "weight and reliability" of a tip, we initially note that the Ohio Supreme Court has recognized three types of informants: (1) the anonymous informant; (2) the known informant (typically an individual with criminal associations who has previously provided reliable information); and (3) the identified citizen informant. Id. at 300. "While the United States Supreme Court discourages conclusory analysis based solely upon these categories, insisting instead upon a totality of the circumstances review, it has acknowledged their relevance to an informant's reliability." Id. In particular, an anonymous informant is "comparatively unreliable and his tip, therefore, will generally require independent police corroboration." Id., citing Alabama v. White (1990), 496 U.S. 325, 329. An identified citizen informant is typically accorded a "greater degree of reliability" and "therefore, a strong showing as to the other indicia of reliability may be unnecessary[.]" Weisner at 300-301. Such is the case because, " 'if an unquestionably honest citizen comes forward with a report of criminal activity-which if fabricated would subject him to criminal liability-we have found rigorous scrutiny of the basis of his knowledge unnecessary.' " Id. at 300, quoting Illinois v. Gates (1983),462 U.S. 213, 233-234.
 {¶ 33} "Courts have been lenient in their assessment of the type and amount of information needed to identify a particular informant."Weisner at 301. As an example, in Weisner, the Ohio Supreme Court concluded that an individual who provided his name and phone number with law enforcement qualified as an identified citizen informant. Id. at 300-302. Here, the informant provided a name and telephone number and, thus, pursuant to Weisner, we conclude that the informant qualified as an identified citizen informant to be accorded a "greater degree of reliability[.]" Id. at 301. As such, the trial court misappliedWeisner when it incorrectly concluded, in its written opinion, that the informant here provided an anonymous tip necessitating independent corroboration.
 {¶ 34} Nevertheless, categorization of the informant here as an identified citizen informant does not itself determine the outcome of this case. Weisner at 300, 302. "Instead it is one element of our totality of the circumstances review of this informant's tip, weighing in favor of the informant's reliability and veracity." Id. at 302. Continuing our review, we conclude that the informant's basis of knowledge also furthers his credibility. "Typically, a personal observation by an informant is due greater reliability than a secondhand description." Id., citing Gates at 233-234. Here, the citizen's tip about appellee's possible drug activity stemmed from eyewitness observations and not a "secondhand description." Pursuant toWeisner, such circumstances further demonstrate the informant's reliability and veracity. Weisner at 302, citing Gates at 233 234. In fact, as the trial court noted, the information contained within the tip "seemed to check out." (Tr. at 73.) The officer observed a white van in the reported location.
 {¶ 35} Finally, while Officer Freetage made the stop based largely on the tip, he also testified as to the other circumstances giving rise to his suspicion of criminal activity: he came upon an armored van matching the informant's description parked late at night in a dark and otherwise vacant lot next to an abandoned building. Cf. Weisner (investigative stop based solely on information from informant). We conclude that the totality of these circumstances, including the informant's call, supports Officer Freetage's reasonable suspicion of criminal activity and, therefore, his initial "stop" of appellee's vehicle.
 {¶ 36} Reasonable suspicion continued during the investigative stop, in light of the tip, given that Officer Freetage discovered appellee at night in a van with a substantial amount of money in an empty parking lot next to an abandoned building. In finding such continued reasonable suspicion, we also find significant appellee's initial refusal to exit his van despite Officer Freetage's orders, as authorized byPennsylvania v. Mimms (1977), 434 U.S. 106, 108-111, and Maryland v.Wilson (1997), 519 U.S. 408, 414-415. We make such a determination despite appellee's claim that he had legitimate reasons for ignoring Officer Freetage's orders and, instead, recognize the trial court's findings that appellee engaged in "bad conduct" and participated in an "acrimonious * * * exchange" with officers. (Tr. at 75.)
 {¶ 37} In effectuating the investigative stop on appellee, Officer Freetage had authority to maintain "the status quo" to obtain information. See Adams v. Williams (1972), 407 U.S. 143, 146. In this regard, although appellee provided Officer Freetage with evidence that he was cashing checks for Big Lots employees, and although a check cashing fee schedule was "clearly visible[,]" Officer Freetage nonetheless had authority to investigate whether appellee was also engaging in drug-related activity. See State v. Osborne, Athens App. No. 02CA8, 2002-Ohio-5362, at ¶ 10 (recognizing that "the possible existence of an innocent or legal reason for * * * observed conduct does not automatically negate the existence of a reasonable suspicion").
 {¶ 38} As the investigative stop progressed, Officer Freetage developed probable cause to arrest appellee for obstruction of official business, given that appellee's initial refusal to exit his van impeded the officer's investigation. See State v. Lojas (Apr. 21, 1998), Franklin App. No. 97APC08-1082. Obstruction of official business is a first-degree misdemeanor and, therefore, is an offense for which law enforcement may make an arrest. See Columbus City Code Section 2321.32; R.C. 2921.31 and 2935.26. As such, under the Fourth Amendment, officers had authority to search appellee incident to his arrest. Chimel v.California (1969), 395 U.S. 752, 762-763. In concluding as such, we need not discuss the misuse of 911 arrest, given that we have already found support for officers searching appellee incident to his arrest. SeeDoucet v. Telhio Credit Union, Inc., Franklin App. No. 05AP-307,2006-Ohio-4342, at ¶ 18 (recognizing that we need not address issues made moot by a dispositive issue).
 {¶ 39} Next, we note that officers did not search appellee's van incident to the arrest, but, in part, as a protective search for weapons. Such was the case because, as noted above, Officer Freetage testified that it was ultimately decided to release appellee because the county jail would not accept him due to his health problems. Officer Freetage then indicated that they searched appellee's vehicle for weapons to ensure that appellee "wouldn't get back out and be able to shoot or stab somebody or hurt another officer." (Tr. at 35.)
 {¶ 40} Law enforcement may search without a warrant "the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, * * * if the police officer possesses a reasonable belief * * * that the suspect is dangerous and the suspect may gain immediate control of weapons." Michigan v. Long (1983),463 U.S. 1032, 1048-1049. An officer may perform the protective search under the dictates of Long even if the suspect is secured away from the vehicle so long as the officer is going to permit the suspect to return to the vehicle. State v. Parrish, Franklin App. No. 01AP-832, 2002-Ohio-3275, at ¶ 26; State v. Perkins (2001), 145 Ohio App.3d 583,587.
 {¶ 41} Here, Officer Clouse saw, in plain view, a "banana clip with a magazine for an automatic machine gun * * * on the floor behind the seat [where appellee] was seated[.]" (Tr. at 44.) We conclude that such evidence, combined with appellee's uncooperative behavior, provided the officers "reasonable belief" that appellee was dangerous and that he may have gained access to weapons. Consequently, pursuant toParrish and Perkins, and in accordance with Long, the Fourth Amendment allowed officers to perform, without a warrant, the protective search of appellee's vehicle to ensure that appellee did not have access to a firearm upon his release and return to his vehicle irrespective of officers having secured appellee in a cruiser at the time of the search. Based on the officers' combined testimony, we also determine that the officers discovered the firearms and ammunition in areas readily accessible to appellee and in areas near where they saw, in plain view, the "banana clip with a magazine for an automatic machine gun[.]" Thus, we further conclude that the officers properly obtained the firearms and ammunition under the confines of Long. (Tr. at 44.)
 {¶ 42} Next, we recognize that if, like here, a vehicle is lawfully detained, law enforcement officers may utilize a drug dog to sniff the vehicle for drugs, and such a procedure does not constitute a search under the Fourth Amendment. United States v. Place (1983), 462 U.S. 696,707; State v. Lopez, 166 Ohio App.3d 337, 2006-Ohio2091, at ¶ 21. Similarly, such a procedure does not constitute a search under the Ohio Constitution. Lopez at ¶ 21. Once the drug dog indicates an odor of drugs in a lawfully detained vehicle, officers have probable cause to search the vehicle. State v. Nguyen, 157 Ohio App.3d 482,2004-Ohio-2879, at ¶ 22.
 {¶ 43} Here, the drug dog indicated an odor of drugs in appellee's van and, thus, officers had probable cause to search, without a warrant, appellee's van for drugs. The cause for such a search existed independent of the above-noted protective search for weapons and, indeed, Officer Freetage indicated, in part, that officers also searched appellee's van based on the drug dog's indication of an odor of drugs in the van. We further conclude that, under the plain view doctrine, officers were entitled to seize appellee's unlawfully concealed, transported, and maintained weapons, given that officers found the weapons while searching areas of the van that may conceal drugs. SeeState v. Coston, Franklin App. No. 05AP-905, 2006-Ohio-3961, at ¶ 18;Coolidge v. New Hampshire (1971), 403 U.S. 443, 465, 466, fn. 24.
 {¶ 44} In conclusion, we find that Officer Freetage initiated an investigative stop on appellee in accordance with the Fourth Amendment, and we conclude that, during the stop, the officers obtained evidence, including the firearms and ammunition, pursuant to valid searches under the Fourth Amendment. Therefore, we conclude that the trial court erred by granting appellee's motion to suppress evidence, and we sustain appellant's single assignment of error. As such, we reverse the judgment of the Franklin County Court of Common Pleas, and we remand this cause to that court for further proceedings consistent with this opinion.
Judgment reversed and cause remanded.