[Cite as *State v. Ebert*, 2015-Ohio-5012.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                                         :
                                                                  :
    Plaintiff-Appellee                          :          C.A. CASE NO. 26314
                                                                  :
v.                                                              :          T.C. NO. 13CR2740
                                                                  :
ANDREW E. EBERT                                :          (Criminal appeal from
                                                                  :           Common Pleas Court)
    Defendant-Appellant                       :
                                                                  :

    . . . . . . . . . . .

**O P I N I O N**

Rendered on the 4th day of December, 2015.

    . . . . . . . . . .

MICHELE D. PHIPPS, Atty, Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

SCOTT S. DAVIES, Atty. Reg. No. 0077080, 1900 Kettering Tower, 40 North Main Street, Dayton, Ohio 45423
    Attorney for Defendant-Appellant

    . . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant Andrew E. Ebert appeals from his conviction and

sentence, following a no-contest plea, for Carrying a Concealed Weapon (loaded/ready at hand), in violation of R.C. 2923.12(A)(2), a felony of the fourth degree. Ebert contends that the trial erred when it overruled his motion to suppress evidence allegedly obtained as the result of an unlawful search and seizure.

{¶ 2} We conclude that there is evidence in the record to support the trial court's conclusion that no unlawful search and seizure occurred. Accordingly, the judgment of the trial court is Affirmed.

## I. An Anonymous Tip Leads Police to Ebert

{¶ 3} One evening in late August 2013, Dayton Police Detective Danielle Cash was working an overtime assignment at the Regional Transit Authority (RTA) hub located at 4 South Main Street in downtown Dayton, Ohio. Det. Cash's partner that evening was Officer Ron Miller. Both officers were armed and wearing a standard police uniform.

{¶ 4} At about 6:49 p.m., Det. Cash received a dispatch regarding an anonymous tip that a white male passenger named Andrew Ebert, riding on a "number 7" bus, was carrying a green tote bag containing a gun. The caller who provided the information refused to provide a name. Shortly thereafter, Det. Cash observed a number 7 bus arrive at the RTA hub. Accompanied by Officer Miller and two uniformed RTA ambassadors, Det. Cash saw Ebert get off the bus. RTA ambassadors provide security for the RTA hub and provide information to bus patrons. Det. Cash observed a white male with what appeared to be blood on his face exit the bus. The man, who was later identified as Ebert, was carrying a green tote bag.

{¶ 5} Det. Cash encountered Ebert on the platform:

Q. And where was he when you first encountered him?

A. He was getting off the bus and was on the platform.   I saw him get off the bus, and then he was standing on the platform.

Q. Front door, back door?

A. I believe it was towards the rear of the bus.

     * * *

Q. And your first question is to him what's your name?

A. Yes, and I asked what happened because he was bleeding.

Q. Did he indicate what happened?

A. I don't recall.

     * * *

Q. You said what's your name and he said?

A. Andrew Ebert.

Q. And you said I'm looking for you?

A. I believe I'm looking for you, yes.

Q. I believe I'm looking for you.   And then what was the next thing you said to him?

A. I asked him if he had anything on him that I needed to know about.

Q. All right.   Just a general question?

A. Yes.

Q. Do you have anything on you that I need to know about?

A. Yes.

Transcript of Proceedings, March 4, 2014, Pgs. 19-21.

{¶ 6} As soon as Det. Cash ascertained Ebert's identity, she notified dispatch, while within Ebert's hearing, that: "We've located him." Ebert contends that Det. Cash said, "We've got him." That phrasing was used by Ebert's counsel in cross-examination, and also by the trial court in its interrogation of Det. Cash. But on both of these occasions, Det. Cash testified that what she actually said was, "We've located him." Tr. 30, l. 21; Tr. 38, l. 18-19.

{¶ 7} Upon being informed that there was a gun in the bag Ebert was carrying, Det. Cash asked Ebert to give her the bag, and Ebert complied. Det. Cash gave Officer Miller the bag; Miller opened the bag, found the gun, and said "Whoa." Det. Cash took that to mean that Miller had found a gun in the bag.

{¶ 8} Det. Cash then required Ebert to come with her to two other police officers, Andrew Lane and Officer Miquel, who were in the adjacent parking lot with their cruiser. Miquel gave Ebert the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Lane talked to Ebert about the gun. After waiving his right to remain silent, Ebert told Lane that he was bringing the gun to his girlfriend for protection, and that although Ebert had had a permit to carry a firearm, that permit was presently suspended. Ebert was arrested and taken to police headquarters, where he was charged with Carrying a Concealed Weapon.

## II. The Course of Proceedings

{¶ 9} Ebert was indicted on one count of Carrying a Concealed Weapon (loaded/ready at hand), in violation of R.C. 2923.12(A)(2), a felony of the fourth degree.

{¶ 10} Ebert moved to suppress the firearm and ammunition removed from his bag at the time of his detention and subsequent arrest. Ebert also moved to suppress any statements he made to police officers after he was arrested.

{¶ 11} Following a hearing, the trial court overruled Ebert's motion to suppress. The trial court found that because Ebert "was not seized or in custody when he was asked his name and whether he had anything on him," Det. Cash acted reasonably when she requested that he hand over the green bag later found to contain a firearm. The trial court also found that after observing the gun in the bag, "it was reasonable for the police to detain him for further questioning." Finally, the trial court found the statements Ebert made to Officers Miquel and Lane in the police cruiser were not the product of an illegal seizure and were given in full compliance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 12} Thereafter, Ebert pled no contest to one count of Carrying a Concealed Weapon. The trial court found Ebert guilty and sentenced him to community control sanctions. From the judgment of the trial court, Ebert appeals.

### III. Evidence in the Record Supports the Trial Court's Finding that No Unlawful Search or Seizure Occurred

{¶ 13} Ebert's sole assignment of error is as follows:

THE POLICE DENIED ANDREW E. EBERT'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SERACH AND SEIZURE

AND HIS FIFTH AMENDEMENT RIGHT PROHIBITING SELF-INCRIMINATION WHEN IT ILLEGALLY STOPPED MR. EBERT AND THEN INTERROGATED HIM WITHOUT ADVISING HIM OF HIS *MIRANDA* RIGHTS.

**{¶ 14}** Ebert argues that the anonymous tip was insufficient to initially stop Ebert at the RTA hub. Additionally, Ebert argues that the trial court erred when it concluded that he was not in custody for the purposes of *Miranda* despite being surrounded by two uniformed, armed police officers and two uniformed RTA ambassadors who declared "we got him," before improperly soliciting incriminating evidence.

**{¶ 15}** As this Court has previously noted:

Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. *State v. Hurt,* Montgomery App. No. 21009, 2006–Ohio–990.

*State v. Purser,* 2d Dist. Greene No. 2006 CA 14, 2007–Ohio–192, ¶ 11.

{¶ 16} At a suppression hearing, the State bears the burden of proving that a warrantless search or seizure meets Fourth Amendment standards of reasonableness. *Maumee v. Weisner,* 87 Ohio St.3d 295, 297, 720 N.E.2d 507 (1999), citing 5 LaFave, Search and Seizure (3 Ed.1996), Section 11.2(b). In the case of an investigative stop, this typically requires evidence that the officer making the stop was aware of sufficient facts to justify it. *Id.,* citing *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

{¶ 17} When an investigative stop is made in sole reliance upon a police dispatch, the State must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity. *Id.* "This can be accomplished in either of two ways. The State may show that the source had previously provided the officer information that proved to be correct. Or, if that prior experience is lacking or the source was anonymous, the State may show that subsequent events corroborated the substance of the tip. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). However, the corroboration must demonstrate that the tip was 'reliable in its assertion of illegality, not just its tendency to identify a determinate person.' " *State v. Yeatts,* 2d Dist. Clark No. 02CA45, 2002-Ohio-7285, at ¶ 12, citing *Florida v. J.L.*, 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).

{¶ 18} In *Florida v. J.L.,* an anonymous caller reported to the police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. Officers went to the bus stop and found three black males, one of whom, J.L., was wearing a plaid shirt. Apart from the tip, the officers had no reason to suspect any of the three of

criminal activity. The officers did not see a firearm or observe any unusual movements. The officers approached J.L, frisked him, and seized a gun. *J.L.,* 529 U.S. at 268.

{¶ 19} The Supreme Court reversed J.L.'s conviction. It held that an anonymous tip that a person is carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person. *Id.* at 271. The court concluded that the anonymous tip lacked the indicia of reliability necessary to justify a stop, noting that the tip must be reliable in its assertion of illegality, not just its tendency to identify a determinate person. *Id.* at 272. We have followed the reasoning in *J.L.* in numerous cases. *See State v. Riley,* 141 Ohio App.3d 409, 751 N.E.2d 525 (2d Dist.2001) (an anonymous tip describing man in bar who allegedly was carrying concealed weapon in his waistband did not justify protective search of defendant); *State v. Black,* 2d Dist. Montgomery No. 19695, 2003-Ohio-6231 (an anonymous tip from an unidentified female caller that two black males were selling illegal drugs while sitting on the steps of a residence at a specific address without any further corroborating evidence observed by the responding officers did not justify protective search of defendant); *State v. Kemp,* 2d Dist. Montgomery No. 19099, 2002 WL 857697 (Apr. 26, 2002) (an anonymous or otherwise unverified tip giving a description of two men with braids wearing fur coats alleged to be engaged in criminal activity was an insufficient basis for a search).

{¶ 20} "This is not to say that an anonymous caller could never provide the reasonable suspicion necessary for [an investigative] stop." *Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). A stop is lawful if facts relayed are sufficiently corroborated to furnish reasonable suspicion that the defendant was engaged in criminal activity. *Id.* at 331.

{¶ 21} In *State v. Taylor*, 2d Dist. Montgomery No. 22501, 2008-Ohio-6737, an anonymous caller informed the Cincinnati Police Department that a passenger on a Greyhound bus headed north to Detroit was carrying drugs. *Id.* at ¶ 2. The anonymous tip was conveyed to the Miami Township Police Department who sent two officers to intercept the bus. *Id.* at ¶ 3. The officers boarded the bus and identified the defendant as matching the physical description provided by the anonymous tip. *Id.* Ultimately, the defendant was found to be carrying illegal drugs and arrested. The defendant filed a motion to suppress all evidence that was obtained as a result of the initial stop based on the anonymous tip. The trial court overruled the defendant's suppression motion.

{¶ 22} We reversed the trial court's decision, finding in part:

[T]he intrusion upon [the defendant]'s protected liberty interest was the lesser intrusion of an investigative stop, not an arrest, but the principle is the same: the intrusion must be justified by facts and circumstances known to the police, directly or indirectly, *at the moment that the intrusion occurs;* it cannot be justified by information subsequently obtained, even if that information is obtained soon after the intrusion. Otherwise, unlawful stops and arrests could be justified by the evidence obtained as a result thereof, which is inconsistent with the prophylactic purpose of the exclusionary rule.

*Id.* at ¶ 19 (emphasis in the original).

{¶ 23} Because no information was presented at the suppression hearing about the identity of the person who provided the anonymous tip that led to the search of Ebert,

the trial court could not presume any pattern of past reliability on the part of the tipster. *State v. Davis*, 2d Dist. Montgomery No. 22775, 2009-Ohio-2538, ¶ 19.   In our view, the State failed to present evidence that the source had any reliable knowledge of criminal activity. *Id.*   The anonymous tip simply provided information that resulted in Ebert being readily identifiable to the police.   The anonymous tip lacked any indicia of reliability necessary to justify a stop.   Significantly, Det. Cash testified that the sole reason she engaged Ebert in conversation was because of the dispatch, which resulted from the anonymous tip.   Additionally, Det. Cash testified that prior to approaching Ebert, she did *not* observe him acting in suspicious manner.   According to Det. Cash, Ebert did not make any furtive movements, nor was he observed reaching into the green bag.   On the record before us, we conclude that the State failed to establish any subsequent events and/or actions that corroborated the suggestion of criminal conduct contained in the anonymous tip.[1]

{¶ 24} The question then arises, when was Ebert stopped?   In overruling Ebert's motion to suppress, the trial court found that Ebert's interaction with Det. Cash was consensual up – i.e., did not constitute a stop – until he told her that there was a gun in the bag he was carrying, relying upon *U.S. v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).   In *Mendenhall*, the Supreme Court considered whether two agents of the Drug Enforcement Administration (DEA) acted lawfully when they approached a suspect in an airport because she fit a drug courier profile, identified themselves as federal agents, asked to see her ticket and identification, asked her to

---

[1]Although blood was noted on Ebert's face, the anonymous tip did not include information suggesting that Ebert had been involved in a fight.

accompany them to a DEA office which was located up a flight of stairs and fifty feet away and proceeded to search her person after obtaining her consent. *Id.* at 554–58. The Supreme Court concluded that the DEA agents did not violate the suspect's Fourth Amendment protections at any point because the entire encounter was consensual. *Id.* at 559–60.

{¶ 25} We conclude that there is evidence in the record to support the trial court's conclusion that the interaction between Ebert and Det. Cash was initially a consensual encounter, not becoming a detention until the presence of the gun was disclosed. As noted above, Det. Cash testified that she said, in Ebert's hearing, "We've located him," not "We've got him." There is no evidence in the record that Det. Cash, Officer Miller, and the two RTA ambassadors "surrounded" Ebert. Det. Cash testified that the others were with her when she approached Ebert on the platform and engaged him in conversation, with Miller just behind her and "catty-corner" to her side. There is no testimony that either police officer brandished or drew a weapon, or otherwise acted in a threatening or imperious manner.

{¶ 26} We agree with the trial court that once Ebert told Det. Cash about the gun in his bag, at a major downtown bus hub, it was reasonable for her to detain Ebert, at least briefly, for further investigation. Of course, once Ebert, having been *Mirandized*, told Officer Lane that he had the gun in his bag, and that his permit to carry a firearm was suspended, there was probable cause to arrest Ebert for the offense with which he was later charged, and convicted.

{¶ 27} Ebert's sole assignment of error is overruled.

## IV. Conclusion

{¶ 28} Ebert's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . .

WELBAUM, J., concurs.

DONOVAN, J., dissenting:

{¶ 29} I disagree. Det. Cash testified that she was close enough to Ebert that Ebert heard what she said to dispatch about him. Det. Cash also testified that the only reason she initially approached Ebert was because of the anonymous tip broadcast by police dispatch. Unlike *Mendenhall*, this was not a profile situation.

{¶ 30} *Florida v. J. L.* stands for the proposition that an anonymous tip that a person is carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person. *Id.* at 271. The United States Supreme Court emphasized that an anonymous tip lacked the indicia of reliability necessary to justify a stop, noting that the tip must be reliable in its assertion of illegality, not just its tendency to identify a determinate person. *Id.* at 272.

{¶ 31} In my view, *Mendenhall* is clearly distinguishable from the instant case since it did not involve the authorities stopping an individual based upon an uncorroborated anonymous tip. Rather, the DEA agents in *Mendenhall* initiated a consensual encounter with the defendant based upon established drug-courier profiling.

{¶ 32} Ebert was stopped by four uniformed officers as he exited a bus. The stop occurred on what was described as the bus platform. The officers were in close proximity

to Ebert.  I cannot comprehend how this can be characterized as consensual.  I would reverse.

. . . . . . . . . .

Copies mailed to:

Michele D. Phipps
Scott S. Davies
Hon. Timothy N. O'Connell