[Cite as *State v. Reno*, 2017-Ohio-4326.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 27229 |
| | : | |
| v. | : | T.C. NO. 16-CRB-3557 |
| | : | |
| RAY L. RENO | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___16th___ day of _____June_____, 2017.

. . . . . . . . . . .

ANDREW D. SEXTON, Atty. Reg. No. 0070892, Assistant City Prosecutor, 335 W. Third Street, Rm. 390, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

J. JOSEPH HYDE, Atty. Reg. No. 0093802, Assistant Public Defender, 117 S. Main Street, Suite 400, Dayton, Ohio 45422
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

        {¶ 1} Defendant-appellant Ray L. Reno appeals his conviction and sentence for one count possession of a drug abuse instrument, in violation of R.C. 2925.12(A), a misdemeanor of the second degree.   Reno filed a timely notice of appeal with this Court

on August 16, 2016.

{¶ 2} The incident which forms the basis of the instant appeal occurred on May 29, 2016, at approximately 11:00 p.m., when Dayton Police Officers Bryan Camden and Angela Woody were dispatched to investigate a suspicious person complaint at the 1400 block of Steiner Avenue in Dayton, Ohio. The dispatch was based upon an anonymous tip from a female who only identified herself as "Mrs. Jones." Both Officer Camden and Officer Woody testified that they did not know "Mrs. Jones," nor did either officer attempt to make contact with her. "Mrs. Jones" stated that she personally observed an unidentified white male walking down an alley south of Steiner Avenue "looking into" or "checking around" garages. "Mrs. Jones" further described the white male as wearing a gray shirt, a hat of unknown color, and blue jeans. "Mrs. Jones" claimed that she had personally witnessed the unidentified white male acting suspiciously only five minutes before she decided to call the police.

{¶ 3} Acting upon the tip from "Mrs. Jones," Officers Camden and Woody, who were in a marked police cruiser, traveled to where the suspicious person had been seen and began a search of the area. The officers did not initially observe anyone in the alley south of Steiner Avenue where the tip originated. However, upon further investigation of the surrounding area, the officers observed a white male, later identified as Reno, walking down a sidewalk located at the corner of Steiner Avenue and Euclid Avenue. Both Officers Camden and Woody testified that the individual was wearing a light tan shirt, blue jeans, but no hat. Neither officer observed Reno engaged in any illegal activity when they first located him. Both officers testified that Reno's appearance closely matched the description provided by "Mrs. Jones."

{¶ 4} Officer Camden testified that at that point he shined his cruiser's spotlight on Reno. Officer Woody testified that Officer Camden gave Reno a distinct order to stop. Officer Camden testified that Reno looked to his left at the police cruiser and then immediately "bladed" his body to the right and began reaching towards his right torso area. The officers both defined the act of "blading" as when a suspect abruptly turns his body away from police at an angle where his or her hands cannot be seen. After Reno turned away from the police and began reaching towards his right side, Officer Camden ordered him to stop moving and show his hands. Based upon Reno's actions up to this point, Officer Camden believed that he may have been carrying a concealed weapon.

{¶ 5} Officer Camden exited his cruiser and began a pat down search of Reno. Officer Camden discovered a hypodermic syringe in the right front pocket of Reno's jeans. After finding the syringe, the officers subsequently observed further signs of Reno's drug use, namely that his pupils were dilated, and he had puncture marks on his arms. Reno was then arrested and taken into custody.

{¶ 6} On May 31, 2016, Reno was charged by complaint with one count of possession of drug paraphernalia and one count of possession of a drug abuse instrument. At his arraignment on the same day, Reno pled not guilty to both counts and was released on his own recognizance.

{¶ 7} On June 22, 2016, Reno filed a motion to suppress, wherein he argued that the police violated his constitutional rights when they performed a warrantless search of his person based upon an uncorroborated tip from an anonymous informant. After a hearing held on July 19, 2016, the trial court overruled Reno's motion to suppress from the bench. The trial court later issued a decision and entry overruling Reno's motion on

July 19, 2016.

{¶ 8} Shortly thereafter on August 4, 2016, Reno pled no contest to one count of possession of a drug abuse instrument, in violation of R.C. 2925.12(A), a misdemeanor of the second degree. The State dismissed the remaining count. The trial court sentenced Reno to ninety days jail, suspended, a fine of $200.00, also suspended, and court costs. Reno was placed on supervised probation for one year, ordered to abstain from the use of alcohol and/or drugs, and ordered to complete treatment at the Cornerstone Project. On August 17, 2016, Reno filed a motion for stay of execution of his sentence pending the outcome of his appeal. The trial court granted Reno's motion for stay of his sentence on August 22, 2016.

{¶ 9} It is from this judgment that Reno now appeals.

{¶ 10} Reno's sole assignment of error is as follows:

{¶ 11} "THE TRIAL COURT ERRED WHEN IT REFUSED TO SUPPRESS THE EVIDENCE OBTAINED FROM MR. RENO IN VIOLATION OF HIS 4TH AMENDMENT RIGHTS."

{¶ 12} In his sole assignment, Reno argues that the trial court erred when it overruled his motion to suppress. Specifically, Reno contends that the uncorroborated tip from an anonymous informant did not provide the police with reasonable suspicion to initiate an investigative stop.

{¶ 13} In deciding a motion to suppress, " 'the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.' " *State v. Hopfer,* 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist.1996), quoting *State v. Venham,* 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th

Dist.1994). "The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record." *State v. Isaac,* 2d Dist. Montgomery No. 20662, 2005–Ohio–3733, ¶ 8, citing *State v. Retherford,* 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). Accepting those facts as true, the appellate court must then determine as a matter of law, without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. (Citation omitted.) *Id.*

{¶ 14} Initially, we note that the only witnesses who testified at the hearing held on Reno's motion to suppress were Officers Camden and Woody. The trial court found the officers' testimony to be credible and adopted it as the court's factual findings.

{¶ 15} As noted above, Reno's motion to suppress raises search and seizure issues under the Fourth Amendment to the United States Constitution, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" Searches and seizures conducted without a warrant are per se unreasonable unless they come within one of the " 'few specifically established and well delineated exceptions.' " *Minnesota v. Dickerson,* 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), quoting *Thompson v. Louisiana,* 469 U.S. 17, 20, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984). Evidence is inadmissible if it stems from an unconstitutional search or seizure. *Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

{¶ 16} At a suppression hearing, the State bears the burden of proof that a warrantless search or seizure was reasonable for Fourth Amendment purposes. *Maumee v. Weisner,* 87 Ohio St.3d 295, 297, 720 N.E.2d 507 (1999). In the case of an

investigative stop, that typically requires evidence that the officer who made the stop was presented with facts sufficient to justify it. *Id.*

{¶ 17} "An investigative stop, or *Terry* stop, is a common exception to the Fourth Amendment warrant requirement." *State v. Carrocce,* 10th Dist. Franklin No. 06AP–101, 2006–Ohio–6376, ¶ 28, citing *Terry v. Ohio,* 392 U.S. 1, 20–22, 30–31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An officer may conduct an investigative *Terry* stop on an individual if the officer has a reasonable suspicion, based upon specific and articulable facts, that criminal behavior has occurred or is imminent. *Terry* at 20, 21, 30, 31.

{¶ 18} Instead of employing an inflexible standard to determine whether an officer has a reasonable suspicion of criminal activity, its determination involves a consideration of "the totality of the circumstances." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Accordingly, "both the content of information possessed by police and its degree of reliability" are pertinent when determining whether there is a reasonable suspicion of criminal activity to justify a stop. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

{¶ 19} Under a totality of the circumstances approach to determining whether reasonable suspicion exists, both the content of the information possessed by police and its degree of reliability are relevant to the court's determination. *Maumee,* 87 Ohio St.3d at 299. "When an investigative stop is made in sole reliance upon a police dispatch, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity. [*Maumee* at 298]. 'This can be accomplished in either of two ways. The State may show that the source had previously provided the officer information that proved to be correct. Or, if that prior

experience is lacking or the source was anonymous, the State may show that subsequent events corroborated the substance of the tip. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). However, the corroboration must demonstrate that the tip was "reliable in its assertion of illegality, not just its tendency to identify a determinate person." ' *State v. Yeatts,* 2d Dist. Clark No. 02CA45, 2002-Ohio-7285, at ¶12 , citing *Florida v. J.L.*, 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000)." *State v. Ebert*, 2d Dist. Montgomery No. 26314, 2015-Ohio-5012, ¶ 17. "A telephone tip, standing alone, can create reasonable suspicion justifying an investigatory stop where the tip has sufficient indicia of reliability." *State v. Works,* 2d Dist. Montgomery No. 19557, 2003-Ohio-4720, ¶ 18. "Factors considered highly relevant in determining the value of an informant's tip are the informant's veracity, reliability, and basis of knowledge." *Id; Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

{¶ 20} Ohio courts have recognized three categories of informants: (1) citizen informants, (2) known informants, i.e., those from the criminal world who have previously provided reliable tips, and (3) anonymous informants, who are comparatively unreliable. *Maumee*, 87 Ohio St.3d at 300. "[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity" in order to justify an investigative stop. *Alabama v. White*, 496 U.S. at 329, 110 S.Ct. 2412, 110 L.Ed.2d 301.

{¶ 21} " 'This is not to say that an anonymous caller could never provide the reasonable suspicion necessary for [an investigative] stop.' *Alabama v. White* (1990), 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301. A stop is lawful if facts relayed are sufficiently corroborated to furnish reasonable suspicion that the defendant was engaged in criminal activity. *Id.* at 331." *State v. Davis,* 2d Dist. Montgomery No. 22775,

2009-Ohio-2538, ¶ 17. "In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *State v. Jordan,* 104 Ohio St.3d 21, 2004-Ohio-6085, 817 N.E.2d 864, ¶ 47.

{¶ 22} In support of his argument that the trial court erred when it denied his motion to suppress, Reno cites to *State v. Shepherd,* 122 Ohio App.3d 358, 701 N.E.2d 778 (2d Dist.1997). In *Shepherd,* a motorist who was stopped in a "high crime" area for a muffler violation reported that a woman who was in his car only moments before, had attempted to sell drugs to the driver and his two passengers, but was unable to complete the transaction because she fled when she saw police approaching. The driver gave officers a description of the woman, describing her attire in detail.

{¶ 23} Officers left the scene after citing the driver for a muffler violation. When they returned to the same location about half an hour later, officers saw a woman matching the description they were given. She was standing in an alley, talking with two men. Officers approached her and said that they needed to ask her some questions, and would have to perform a visual search for weapons. While peering inside the left breast pocket of the woman's coat, officers discovered what appeared to be drugs. The woman removed the article and gave it to an officer, who confirmed that it was drugs. The woman was arrested and subsequently charged with drug abuse.

{¶ 24} The trial court denied a motion to suppress evidence the officers seized. We reversed on appeal, finding that the corroboration on which the officers relied was

insufficient to satisfy the *Terry* standards, for several reasons.

**{¶ 25}** We noted in *Shepherd* that the police informant, the driver of the car, admitted that he'd been involved in a drug transaction with the woman the informant described, and because he was "a criminal suspect under police detention, with every incentive to point (officers) in another direction, (the informant's) information should have been regarded with the highest scrutiny." *Id.,* at 367, 701 N.E.2d 778. We found that the fact that the woman's clothing matched the description in the tip was so neutral a detail that, without more, it created no reasonable and articulable suspicion. We rejected the State's contention that because the stop occurred in a "high crime" area, that contributed to the degree of suspicion required. However, we also noted that even though "the information provided by the informant was not sufficient to constitute reasonable suspicion does not mean that it did not warrant further investigation by law enforcement officers." *Id.,* at 369, 701 N.E.2d 778.

**{¶ 26}** *Shepherd*, however, is distinguishable from the instant case. First, unlike the informant in *Shepherd,* there was no reason to automatically question "Mrs. Jones's" veracity. The caller was not, so far as the officer knew, involved in any criminal activity relating to the tip. Indeed, the caller wasn't an "informant" at all, at least in the sense of a person who acquired the information because of participation in some criminal activity. The caller was a complainant who asked police for assistance against crime or suspicion thereof. There was nothing inherent in that which ought to cause officers to doubt what they were told.

**{¶ 27}** Second, unlike the half-hour that had passed since the alleged criminal activity in *Shepherd,* only approximately five minutes had passed here after the call was

made when the officers arrived on the scene. The fact that Reno was in close proximity to the location concerned is therefore of more significance, especially in view of the time, 11:00 p.m., and the fact that no one else was about the area.

{¶ 28} Here, the evidence adduced at the suppression hearing established that at approximately 11:00 p.m. on May 29, 2016, Officers Camden and Woody were dispatched to investigate a suspicious person complaint in the 1400 block of Steiner Avenue in Dayton, Ohio. The dispatch was based upon an anonymous tip from a female who only identified herself as "Mrs. Jones." Both Officer Camden and Officer Woody testified that they did not know "Mrs. Jones," nor did either officer attempt to make contact with her. The anonymous informant stated that she personally observed an unidentified white male walking down an alley south of Steiner Avenue "looking into" or "checking around" garages. The informant further described the white male as wearing a gray shirt, a hat of unknown color, and blue jeans.

{¶ 29} Officer Camden testified that he and Officer Woody arrived at the location, an area of Dayton also known as DeSoto Bass, within five minutes of the dispatch. Although the officers failed to locate anyone in the alley behind Steiner Avenue, upon further investigation of the nearby surrounding area, the officers observed a white male, later identified as Reno, walking down a sidewalk located at the corner of Steiner Avenue and Euclid Avenue, in close proximity to the alley where the search began. Both Officers Camden and Woody testified that the individual was wearing a light tan shirt, blue jeans, but no hat. Both officers testified that Reno's appearance closely matched the description provided by the anonymous informant.

{¶ 30} Other than the anonymous tipster identifying herself as "Mrs. Jones," no

additional information was presented at the suppression hearing about the identity of the person who provided the anonymous tip that led to the search of Reno. Accordingly, the trial court could not presume any pattern of past reliability on the part of the tipster. *State v. Davis,* 2d Dist. Montgomery No. 22775, 2009–Ohio–2538, ¶ 19. Thus, standing alone, the anonymous tip supplied by "Mrs. Jones" was insufficient to support a reasonable suspicion for an investigative stop and pat down of Reno. *Compare State v. Ebert*, 2d Dist. Montgomery No. 26314, 2015-Ohio-5012, ¶ 23.

{¶ 31} In finding that the anonymous tip in *Ebert* lacked any indicia of reliability necessary to justify a stop, we stated the following:

> *** Significantly, Det. Cash testified that the sole reason she engaged Ebert in conversation was because of the dispatch, which resulted from the anonymous tip. Additionally, Det. Cash testified that prior to approaching Ebert, she did *not* observe him acting in suspicious manner. According to Det. Cash, Ebert did not make any furtive movements, nor was he observed reaching into the green bag. On the record before us, we conclude that the State failed to establish any subsequent events and/or actions that corroborated the suggestion of criminal conduct contained in the anonymous tip.

*Id.* at ¶ 23.

{¶ 32} Similar to the defendant in *Ebert*, the anonymous tip provided Officers Camden and Woody with information that resulted in Reno being readily identifiable to the police. However, unlike *Ebert*, when Officer Camden shined his cruiser's spotlight on Reno and ordered him to stop, he looked at the police cruiser and then abruptly turned

away from the police at an angle where his hands could not be seen (i.e., "blading") and began reaching down towards the right side of his body.   Officer Camden immediately ordered Reno to stop moving.   An officer may conduct a limited search of an individual subject to an investigatory stop where the officer has a reasonable suspicion that the individual is armed. *State v. Williams*, 51 Ohio St.3d 58, 61, 554 N.E.2d 108 (1990). Based upon his furtive movements, Officer Camden and Officer Woody both testified that they believed Reno may be carrying a concealed weapon and attempting to conceal it. Specifically, Officer Woody testified as follows:

> The State: Now, when – Officer Woody, three years on the force, you've been trained – have you been trained to observe dangerous situations?
>
> Officer Woody: Yes, sir.
>
> Q: You've been trained to observe when an officer might be in danger?
>
> A: Yes, sir.
>
> Q: And in your – did your training tell you that you might be or Officer Camden and/or you may well be in danger at that juncture?
>
> A: Yes, sir.
>
> Q: Could you describe why, please?
>
> A: A lot of times, in my experience, when people are reaching towards their thighs and the area of their pockets, often times they have guns, knives, assorted weapons.
>
> Q: And that is part of your training and education as a police officer?
>
> A: Yes, sir. It is.
>
> Q: Ok.   Is that part of your experience, practically, as a police officer?

A: Yes, sir.   It is. Most certainly.[1]

**{¶ 33}** The race and limited clothing identifiers corroborative of the anonymous tip did not establish a reasonable, articulable suspicion to justify a stop and search of Reno. However, Reno's contemporaneous conduct when the officers approached him, to wit: "blading," justified the seizure and search of Reno.   Accordingly, we agree with the trial court that, under the totality of the circumstances presented to the officers, it was reasonable for Officer Camden to seize Reno and pat him down for weapons, which resulted in the discovery of the hypodermic needle in Reno's right front pants pocket. Thus, the trial court did not err when it overruled Reno's motion to suppress.   In affirming the denial of Reno's motion to suppress, we acknowledge that this is not a strong case for the State; however, we must defer to the factual findings made by the trial court.

**{¶ 34}** Reno's sole assignment of error is overruled.

**{¶ 35}** Reno's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and WELBAUM, J., concur.

---

[1] We note that in its written decision, the trial court stated that "Defendant turned his side and reached for his *door* and put his hand to his side."   We further note that no evidence was adduced that Reno ever "reached for [a] door" when he was stopped by Officers Camden and Woody.   The trial court's written decision therefore differs from its oral findings made at the conclusion of the hearing on Reno's motion to suppress. Specifically, we defer to the trial court's oral finding that "upon encountering [Reno], [Officers Camden and Woody] asked [Reno] to stop and that [Reno] made a sudden movement."   The trial court never orally stated that Reno ever reached for a "door." This discrepancy, however, was not raised by Reno in his brief, and we therefore only make note of the discrepancy for clarity's sake.

Copies mailed to:

Andrew D. Sexton
J. Joseph Hyde
Hon. Carl Sims Henderson