[Cite as *State v. Smith*, 2019-Ohio-4370.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-5 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-550 |
| | : | |
| DOUGLAS A. SMITH, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 25th day of October, 2019.

. . . . . . . . . . .

DAVID M. MORRISON, Atty. Reg. No. 0087487, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, 61 Greene Street, Suite 200, Xenia, Ohio 45385
        Attorney for Plaintiff-Appellee

KRISTIN ARNOLD, Atty. Reg. No. 0088794, 120 West Second Street, Suite 1717, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-appellant, Douglas A. Smith, Jr., appeals from his conviction in the Greene County Court of Common Pleas after he pled no contest to four counts of possession of drugs. In support of his appeal, Smith contends that the trial court erred in overruling his motion to suppress the drug evidence found on his person and the incriminating statements he made to law enforcement. Specifically, Smith claims that the drugs and statements were obtained as the result of an unlawful detention and pat-down search. For the reasons outlined below, we conclude that the trial court did not err in overruling Smith's motion to suppress. The judgment of the trial court will therefore be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On October 9, 2017, the Greene County Grand Jury returned an indictment charging Smith with one count of possession of heroin, one count of possession of a controlled substance analog (carfentanil), one count of aggravated possession of drugs (fentanyl), and one count of possession of cocaine, all fifth-degree felonies. The charges arose after Smith encountered Sergeant Beth Prall of the Greene County Sheriff's Department, who was investigating a citizen's complaint that Smith's vehicle had been driving recklessly. During the encounter, Sgt. Prall conducted a pat-down search on Smith and discovered drugs on his person.

{¶ 3} After being indicted, Smith pled not guilty to all of the charges. Smith thereafter moved to suppress the drug evidence found on his person and the incriminating statements that he had made to Sgt. Prall during the encounter. The trial court held a hearing on Smith's motion suppress on March 22, 2018. At the suppression hearing, the

State presented testimony from Sgt. Prall and admitted video footage from a body camera worn by Sgt. Prall on the day she encountered Smith.

{¶ 4} Sgt. Prall testified that on April 28, 2017, the Greene County Sheriff's Department received a complaint that a van traveling eastbound on US-35 in the area of Fairfield Road was driving recklessly, that the driver of the van was nodding off, and that the passenger in the van was unconscious. Sgt. Prall testified that the complaint was made by a private citizen who had called the Beavercreek Police Department. According to Sgt. Prall, the Beavercreek Police Department transferred the call to the Sheriff's Department and the Sheriff's Department thereafter put out a dispatch detailing the citizen's complaint.

{¶ 5} Sgt. Prall testified that she recognized the complainant's description of the van as a van having been involved in several prior incidents with law enforcement. Following the dispatch, Sgt. Prall observed the van parked in the parking lot of a Circle K gas station off US-35 on Orchard Lane. Sgt. Prall testified that she never saw the van in motion and did not witness any reckless driving. Sgt. Prall nevertheless testified that she wanted to check on the van's occupants to make sure they were in a condition to be driving. To do this, Sgt. Prall pulled into the Circle K gas station and made contact with the van's occupants, who were later identified as Smith and Smith's wife, Jessica Pitzer, a.k.a. Jessica Smith.

{¶ 6} Continuing, Sgt. Prall testified that upon initial contact with Smith, Smith's demeanor was "cooperative," but "his eyes were pinpoint and it was pretty clear that he was under the influence of something." Suppression Hearing Trans. p. 6. Sgt. Prall also testified that she recognized Smith from a prior drug incident during which Smith had

overdosed. In addition to these observations, Sgt. Prall testified that the behavior of Smith's wife was "extremely erratic" and that Smith's wife was "crying and carrying on." *Id.* at 7. The body camera footage confirms this testimony, as it established that Smith's wife started crying after she gave her personal identification information to Sgt. Prall and then continued to cry throughout the encounter.

{¶ 7} Sgt. Prall also testified that Smith "was kind of nervous" and giving her "some danger clues." *Id.* For example, Sgt. Prall testified that she had to keep ordering Smith to remove his hands from his pockets. The body camera footage establishes that Sgt. Prall first ordered Smith to remove his hands from his pockets within the first 15 seconds of the encounter and then at least two other times thereafter. After Sgt. Prall gave the first order for Smith to remove his hands from his pockets, the body camera footage shows that Smith immediately advised Sgt. Prall that he had a small pocket knife on his person and pointed to his right-front pants pocket. Sgt. Prall testified that she did not simply ask Smith to hand her the knife due to safety concerns. Instead, Sgt. Prall testified that she waited for the arrival of a backup officer so that she could then conduct a pat-down search.

{¶ 8} Once a backup officer arrived, Sgt. Prall conducted a pat-down search of Smith's person and retrieved the knife from Smith's pants pocket. Sgt. Prall testified that as she was retrieving the knife from the pocket, she also felt a baggie filled with some sort of substance. Sgt. Prall testified that based on her training and experience, she believed the substance in the baggie was an illegal narcotic because "it's very typical for drugs—specifically heroin or cocaine—to be packaged that way for sale." *Id.* at 9. With regard to her experience, Sgt. Prall testified that she had been in law enforcement for a

total of 19 years and that she had served as a Greene County Sheriff's Officer for three years.

{¶ 9} After retrieving the baggie from Smith's pocket, Sgt. Prall recognized the substance in the baggie to be heroin. Once Sgt. Prall discovered the baggie of heroin, the body camera footage showed Sgt. Prall asking Smith when he "shot up" last. Smith responded by saying: "This morning." Sgt. Prall then stated: "Your eyes are telling me something completely different." Smith then asked to speak with Sgt. Prall away from his wife, who was still crying and upset. Sgt. Prall agreed to speak with Smith away from his wife, and the two walked away to have a private discussion.

{¶ 10} During the private discussion, Smith indicated that he was going to lose his marriage and explained that his wife had her suspicions about his drug use. Smith then made a statement to Sgt. Prall insinuating that he had used heroin earlier that day while he was in Dayton. To confirm what Smith was saying, Sgt. Prall said: "So you went to Dayton to get heroin?" Smith responded by nodding affirmatively.

{¶ 11} Later in the conversation, Sgt. Prall asked Smith if there was anything illegal in the van. In response, Smith stated that there was nothing in the van worse than what was already found in his pocket. Smith also told Sgt. Prall that he had used drugs three hours ago and that he was never driving the van. Following their conversation, Sgt. Prall told Smith that he was not under arrest and asked him to have a seat in her cruiser. Immediately before Smith entered the cruiser, Sgt. Prall read Smith his *Miranda* rights and once again advised Smith that he was not under arrest.

{¶ 12} Based on Sgt. Prall's testimony and the body camera footage of the encounter, the trial court overruled Smith's motion to suppress. In so holding, the trial

court found that the encounter between Sgt. Prall and Smith was a lawful investigatory detention. The trial court also found that Sgt. Prall conducted a lawful pat-down search of Smith's person and that the drugs discovered during the pat-down search were lawfully seized under the plain-feel doctrine.

{¶ 13} After the trial court issued its decision, Smith agreed to plead no contest to all the charges in the indictment. The trial court accepted Smith's no contest plea and found him guilty as charged. At sentencing, the trial court ordered Smith to serve five years of community control, which included a six-month jail term and chemical dependency and mental health treatment. Smith now appeals from his conviction, raising a single assignment of error for review.

**Assignment of Error**

{¶ 14} Under his sole assignment of error, Smith contends that the trial court erred in overruling his motion to suppress. In support of this claim, Smith asserts that he was unlawfully detained by Sgt. Prall. Smith also asserts that Sgt. Prall conducted an unlawful pat-down search of his person. Based on this alleged unlawful conduct, Smith contends that all of the drug evidence and incriminating statements flowing from the detainment and pat-down search should have been suppressed. We disagree.

*Standard of Review*

{¶ 15} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the

credibility of witnesses." (Citation omitted). *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." (Citation omitted.) *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citation omitted.) *Id.*

*Smith's Detainment Was Lawful*

{¶ 16} As noted above, Smith contends that the drug evidence and incriminating statements obtained from his encounter with Sgt. Prall should have been suppressed because he was unlawfully detained during the encounter. Smith claims that his detainment was unlawful because it was based solely on an uncorroborated tip from an anonymous informant. According to Smith, the uncorroborated tip did not give rise to a reasonable suspicion of criminal activity justifying his detainment. Upon review, we find no merit to Smith's claim.

{¶ 17} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated * * *.' " *State v. Retherford,* 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). "It is well established that these guarantees are not implicated in every situation where the police have contact with an individual." *State v. Taylor*, 106 Ohio App.3d 741, 747, 667 N.E.2d 60 (2d Dist.1995), citing *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) and *Retherford.* "The United States

Supreme Court has created three categories of police-citizen contact to identify the situations where these guarantees are implicated." *Id.*, citing *Florida v. Royer*, 460 U.S. 491, 501-507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). These three categories are: (1) consensual encounters; (2) investigatory detentions; and (3) seizures in the nature of an arrest. *Retherford* at 594-595; *Taylor* at 747-749.

{¶ 18} The State asserts that Sgt. Prall's initial contact with Smith and his wife was a consensual encounter that later transformed into an investigatory detention. Consensual encounters are not seizures, and the Fourth Amendment guarantees are not implicated in such encounters. *Taylor* at 747-749, citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). "Consensual encounters occur when the police merely approach a person in a public place and engage the person in conversation, and the person remains free not to answer and to walk away." *State v. Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 21, citing *Mendenhall* at 553. "A consensual encounter remains consensual even if police officers ask questions, ask to see the person's identification, or ask to search the person's belongings, provided 'the police do not convey a message that compliance with their requests is required.' " *State v. Westover*, 2014-Ohio-1959, 10 N.E.3d 211, ¶ 15 (10th Dist.), quoting *Florida v. Bostick*, 501 U.S. 429, 435, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). (Other citations omitted.) *Accord State v. Ward*, 2017-Ohio-1391, 89 N.E.3d 124, ¶ 26 (2d Dist.). In this regard, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Bostick* at 437, quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d

565 (1988).

{¶ 19} "Unlike consensual encounters, an investigatory detention constitutes a seizure; therefore, Fourth Amendment protections are implicated in an investigatory detention." (Citations omitted.) *State v. Shern*, 2018-Ohio-5000, 126 N.E.3d 322, ¶ 13 (2d Dist.). "An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or [was] compelled to respond to questions." *Lewis* at ¶ 22, citing *Mendenhall* at 553.

{¶ 20} After reviewing Sgt. Prall's body camera footage, we find that the footage supported the trial court's finding that the encounter was an investigatory detention as opposed to a consensual encounter turned investigatory detention. The body camera footage showed that, after Sgt. Prall parked behind the Smiths' van and exited her cruiser, Sgt. Prall immediately asked the Smiths if they were the occupants of the van and instructed them to "come over here" by waiving them over to her. Smith's wife then attempted to speak and Sgt. Prall interrupted her by saying: "No, we got complaints on your driving." Sgt. Prall then immediately instructed Smith to keep his hands out of his pockets. This exchange occurred within the first 15 seconds of the encounter. Based on the way Sgt. Prall spoke to the Smiths and gave orders, a reasonable person would not have believed that they were free to leave and ignore Sgt. Prall's requests. Rather, Sgt. Prall's orders and tone of voice conveyed that she was investigating a complaint about the Smiths' driving and that their compliance with her requests was required.

{¶ 21} During investigatory detentions like the one at issue, "police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal

activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot[.]" *State v. Swift*, 2d Dist. Montgomery No. 27036, 2016-Ohio-8191, ¶ 10, citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). (Other citations omitted.) Whether officers have reasonable suspicion is determined by evaluating the totality of the circumstances, which must be considered " 'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). "This 'typically requires [a showing] that the officer making the stop was [personally] aware of sufficient facts to justify it,' although 'when an investigative stop is made in sole reliance upon a police dispatch, different considerations apply.' " *State v. Pickett*, 2017-Ohio-5830, 94 N.E.3d 1046, ¶ 9 (2d Dist.), quoting *City of Maumee v. Weisner*, 87 Ohio St.3d 295, 297, 720 N.E.2d 507 (1999).

**{¶ 22}** "Where an officer making an investigative stop relies solely upon a dispatch, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." *Weisner* at paragraph one of the syllabus. *Accord Pickett* at ¶ 9. When the facts precipitating the dispatch are based on a telephone tip from an informant it must be determined whether the informant's tip had "sufficient indicia of reliability to justify the investigative stop." *Weisner* at 299. The Supreme Court of Ohio has specifically held that "[a] telephone tip can, by itself, create reasonable suspicion justifying an investigatory stop where the tip has sufficient indicia of reliability." *Id.* at paragraph two of the syllabus. *Accord Pickett* at ¶ 10.

**{¶ 23}** Factors considered highly relevant in determining whether a tip has

sufficient indicia of reliability include "the informant's veracity, reliability, and basis of knowledge." *Weisner* at 299, citing *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), paragraph (a) of the syllabus and *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *Accord Pickett* at ¶ 10. To assess these factors, informants are categorized into three classes: (1) the anonymous informant; (2) the known informant (someone with criminal associations who has previously provided reliable information); and (3) the identified citizen informant. *Weisner* at 300.

**{¶ 24}** Of these three classes, "an anonymous informant is comparatively unreliable and his tip, therefore, will generally require independent police corroboration." *Id.* at 300, citing *White* at 329. However, even "[t]hough 'a tip might be anonymous in some sense,' it may have certain other features either supporting reliability or narrowing the likely class of informants, so that the tip does provide [a] lawful basis for some police action." (Emphasis omitted.) *Pickett*, 2017-Ohio-5830, 94 N.E.3d 1046, at ¶ 12, quoting *Florida v. J.L.*, 529 U.S. 266, 275, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). (Other citation omitted.)

**{¶ 25}** On the other hand, "[a]n identified citizen informant is typically accorded a 'greater degree of reliability' and 'therefore, a strong showing as to the other indicia of reliability [i.e., indicia other than the classification of the informant], may be unnecessary.' " *State v. Carrocce*, 10th Dist. Franklin No. 06AP-101, 2006-Ohio-6376, ¶ 32, quoting *Weisner* at 300-301. *Accord Pickett* at ¶ 11. When "a citizen-informant * * * is victimized or merely witnesses a crime and reports it out of a sense of civic duty, the police may be entitled to presume that the informer is reliable." (Citations omitted.) *State v. Shepherd*, 122 Ohio App.3d 358, 366, 701 N.E.2d 778 (2d Dist.1997). *See also*

*State v. Jackson*, 2d Dist. Montgomery No. 17226, 1999 WL 115010, *5 (Mar. 4, 1999), quoting *State v. Gress*, 2d Dist. Montgomery No. 16899, 1998 WL 321014, *4-5 (June 19, 1998) (" 'a tip from an identified citizen informant who is a victim or witnesses a crime is presumed reliable, particularly if the citizen relates his or her basis of knowledge' ").

{¶ 26} In *Pickett,* this court held that a tipster who called 9-1-1 was classified an identified citizen informant because the tipster provided his first name and his cellular telephone number. *Pickett* at ¶ 12. Although we held that the tipster's classification as an identified citizen informant did not itself determine the outcome of the case, we nevertheless found that the tip was sufficiently reliable because, in addition to being identified, the tipster personally witnessed the offense being reported and provided as much detail regarding the offense as permitted. *Id.* at ¶ 15.

{¶ 27} Similarly, in *State v. Gregory*, 2d Dist. Montgomery No. 28240, 2019-Ohio-3000, this court held that a telephone tip given to police "was not truly anonymous" because the police had the informant's cell phone number. *Id.* at ¶ 33. We also held that even if the tip in *Gregory* had been anonymous, the tip had sufficient indicia of reliability because the informant had eyewitness knowledge of the crime being reported, witnessed a startling event (a shooting), gave a contemporaneous report of the crime, and reported the crime using the 9-1-1 emergency system, which allows for the tracing of calls. *Id.* at ¶ 35, citing *Navarette v. California*, 572 U.S. 393, 399-401, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014).

{¶ 28} The instant case is similar to both *Pickett* and *Gregory.* In this case, Sgt. Prall stopped and approached Smith and his wife at the Circle K gas station after receiving a dispatch that reported a van matching the description of the Smiths' van driving

recklessly in the area. The radio dispatch originated from a private citizen calling the local authorities and reporting that the van was weaving on the road, that the driver was nodding off, and that the passenger was unconscious. Although Sgt. Prall testified that she did not know the citizen's personal information and did not testify whether the citizen used the 9-1-1 emergency system, Sgt. Prall nevertheless explained that the citizen's tip was not anonymous because it was her understanding that the local authorities had obtained the citizen's information during the call.

{¶ 29} In addition to not being truly anonymous, the citizen provided an eyewitness, contemporaneous report of the reckless driving observed, which startled and concerned the citizen enough to call the local authorities. Pursuant to *Pickett* and *Gregory*, these factors supported the reliability of the private citizen's tip. The fact that Sgt. Prall was able to locate the van in a location that was consistent with the direction of travel reported by the citizen also supported the reliability of the tip. That Sgt. Prall recognized the citizen's description of the van as a van that had been involved in several prior incidents with law enforcement also militated in favor of the tip's reliability. Under these circumstances, we find that the private citizen's tip had sufficient indicia of reliability to give rise to a reasonable suspicion of criminal activity that justified the investigative detention at issue.

{¶ 30} After lawfully initiating the investigative detention, Sgt. Prall uncovered additional information corroborating the citizen's complaint that justified the continued detainment of the Smiths for further investigation. For example, Sgt. Prall testified that during her initial contact with Smith, she observed Smith's eyes were "pinpoint" and that Smith appeared to be "under the influence of something." Suppression Hearing Trans.

p. 6. In addition, while Sgt. Prall was in the process of obtaining identification information for Smith's wife, Sgt. Prall recognized Smith from a prior drug incident where Smith had overdosed and almost died. Smith's wife also began to act erratic after providing her identification information, as she randomly started to cry and continued to cry throughout the encounter. Given these observations, Sgt. Prall had a reasonable, articulable suspicion of either intoxicated driving or a possible medical condition making driving unsafe. Also, later in the encounter, Sgt. Prall learned from dispatch that Smith's license was suspended and that the private citizen caller had reported that the unconscious passenger in the van was a female. Therefore, the continued detention was also warranted to further investigate whether Smith had been driving on a suspended license.

{¶ 31} For the foregoing reasons, Smith's claim that his detainment was unlawful lacks merit, as the record establishes that he was subject to a lawful investigatory detention that was based on a reasonable, articulable suspicion of criminal activity.

*The Pat-Down Search Conducted on Smith Was Lawful*

{¶ 32} Smith next contends that the drug evidence and incriminating statements obtained from his encounter with Sgt. Prall should have been suppressed because Sgt. Prall conducted an unlawful pat-down search. Smith believes the pat-down search was unlawful because it was not based on a reasonable suspicion that he was armed and dangerous. We again disagree.

{¶ 33} "[A]n officer may conduct a limited [pat-down] search of an individual who is the subject of an investigatory detention where the officer has a reasonable suspicion that the individual is armed." *Shepherd*, 122 Ohio App.3d 358 at 370, 701 N.E.2d 778, citing

*State v. Williams*, 51 Ohio St.3d 58, 61, 554 N.E.2d 108 (1990). Therefore, "[t]o justify a pat-down search, an officer must point to specific, articulable facts that create a 'reasonable individualized suspicion that the suspect is armed and dangerous[.]' " *State v. Garrett*, 2018-Ohio-4530, 123 N.E.3d 327, ¶ 50, quoting *State v. Roberts*, 2d Dist. Montgomery No. 23219, 2010-Ohio-300, ¶ 18, citing *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

{¶ 34} Whether officers have a reasonable suspicion is determined by evaluating the totality of the circumstances, which must be considered " 'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047 at ¶ 14, quoting *Andrews*, 57 Ohio St.3d 86 at 87-88, 565 N.E.2d 1271. " 'The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger.' " *Garrett* at ¶ 50, quoting *Terry* at 27.

{¶ 35} In this case, we have already determined that Smith was subjected to a lawful investigatory detention; therefore, Sgt. Prall was permitted to conduct a limited pat-down search of Smith provided that the totality of the circumstances established Sgt. Prall had a reasonable suspicion that Smith was armed and dangerous. Upon reviewing the record, we find that such a reasonable suspicion existed. Specifically, Sgt. Prall testified, and the body camera footage confirms, that Smith advised Prall at the very beginning of the encounter that he had a small pocket knife on his person. Sgt. Prall also testified that Smith was acting nervous during the encounter and exhibited danger clues. For example, Sgt. Prall testified, and the body camera footage confirms, that Smith kept

putting his hands in his pockets after Prall told him to remove them. Since Sgt. Prall would be spending additional time in proximity to Smith to investigate the reckless driving complaint and to determine whether Smith and/or his wife had been using drugs, a pat-down to remove the knife on Smith's person was justified to ensure Sgt. Prall's safety.

{¶ 36} As Sgt. Prall was conducting the lawful pat-down search and removing the knife from Smith's pants pocket, Prall simultaneously felt a baggie filled with a substance that she recognized to be an illegal narcotic. "Under the plain-feel doctrine, an officer conducting a pat-down for weapons may lawfully seize an object if he [or she] has probable cause to believe that the item is contraband." *State v. Lawson*, 180 Ohio App.3d 516, 2009-Ohio-62, 906 N.E.2d 443, ¶ 25 (2d Dist.), citing *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) and *State v. Phillips*, 155 Ohio App.3d 149, 799 N.E.2d 653, 2003-Ohio-5742, ¶ 41-42. For the plain-feel doctrine to apply, "[t]he 'incriminating character' of the object must be 'immediately apparent,' meaning that the police have probable cause to associate an object with criminal activity." *State v. Jacko*, 2d Dist. Montgomery No. 24371, 2011-Ohio-6494, ¶ 32 quoting *Dickerson* at 375. (Other citation omitted.)

{¶ 37} In this case, Sgt. Prall testified that she recognized the substance in Smith's pocket as an illegal narcotic based on her training and experience as a police officer. Sgt. Prall testified that she had 19 years of police experience. Based on that experience, Sgt. Prall testified that "it's very typical for drugs—specifically heroin or cocaine—to be packaged that way [in a baggie] for sale." Suppression Hearing Trans. p. 8. In light of Sgt. Prall's testimony, we find that she had probable cause to believe the baggie contained an illegal narcotic when she felt the baggie in Smith's pocket. Therefore,

under these facts and circumstances, Sgt. Prall was permitted to seize the baggie from Smith's pocket under the plain-feel doctrine.

**{¶ 38}** For the foregoing reasons, we find that Sgt. Prall had a reasonable suspicion that Smith was armed and dangerous to justify conducting a pat-down search. We also find that Sgt. Prall then lawfully discovered the drug evidence on Smith's person pursuant to the plain-feel doctrine. Accordingly, Smith's claim that the pat-down search was unlawful lacks merit.

## Conclusion

**{¶ 39}** Because Smith was subjected to a lawful investigatory detention during which a lawful pat-down search was conducted, the trial court did not err in overruling Smith's motion to suppress. Therefore, Smith's sole assignment of error is overruled. Having overruled Smith's assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies sent to:

David M. Morrison
Kristin Arnold
Hon. Michael A. Buckwalter