[Cite as *State v. Dyson*, 2024-Ohio-5591.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO                           :
                                        :
    Appellant                           :       C.A. No. 30228
                                        :
v.                                      :       Trial Court Case No. 2022 CR 0316
                                        :
AUSTIN DYSON                            :       (Criminal Appeal from Common Pleas
                                        :       Court)
    Appellee                            :
                                        :

. . . . . . . . . . .

O P I N I O N

Rendered on November 27, 2024

. . . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH H. CHANEY, Attorney for Appellant

L. PATRICK MULLIGAN & TIMOTHY R. SAUNDERS, Attorneys for Appellee

. . . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Pursuant to R.C. 2945.67(A) and Crim.R. 12(K), the State of Ohio appeals

from the trial court's judgment granting Austin Dyson's motion to suppress evidence.

The State claims that the police officers had reasonable suspicion that Dyson was armed

and dangerous to justify a pat down for weapons. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} Huber Heights Police Officer Michael Reckner was the sole witness at the suppression hearing. His testimony, along with video recordings from his body camera and cruiser, established the following facts.

{¶ 3} Beginning at 2:00 a.m. on December 11, 2022, Officer Reckner was working road patrol in Huber Heights. While patrolling the area, he was dispatched to a residence on Claybeck Drive on a report that the homeowner had come outside and found that his or her vehicle had been gone through. Reckner drove by the address. The officer testified that, "typically, that time of night, we have cars that are either stolen or gone through. And I believe another officer, Ofc. Waller, found that someone had actually attempted to steal a vehicle, maybe two blocks away." Suppression Tr. at 7.

{¶ 4} Around 3:00 a.m., Officer Reckner observed two individuals, later identified as Patrick Miller and Austin Dyson, walking westbound on Claybeck Drive, three or four blocks from the dispatched location, which was less than a five-minute walk away. The officer exited his cruiser and approached the men, saying, "Hi guys. Where are we coming from?" Miller responded that they were walking home from their buddy's house off of Brandt Pike. Officer Reckner asked if they had identification and told them that he was stopping them because "we've had like two cars tried to be stolen and gone through, just over here." Miller replied that they were walking home from a birthday party. The officer commented that it was "one hellava walk from Brandt." They agreed.

**{¶ 5}** Both men provided identification to the officer, and Officer Reckner called in their information to the dispatcher. He asked the men to keep their hands out of their pockets. While waiting for information on the identifications, the officer asked Miller if he still resided on Troy Manor, which was a couple blocks away; he responded affirmatively. Dyson stated that he was staying with Miller for the night.

**{¶ 6}** Officer Reckner testified that, at that point, the men were not free to leave until he determined who they were and where they were heading. When asked on cross-examination if the only reason he had approached them was because they were the only people within his eyesight, Officer Reckner responded that it was also due to the time of day and he could not tell how old they were. The officer acknowledged that he had not observed any unlawful conduct, and there were no reports of criminal activity in the locations where Miller said they had been and where they were going. Reckner did not observe anything during their interaction that would tie Miller and Dyson to the reported car break-in.

**{¶ 7}** Officer Reckner then asked the men if they had anything on them that he "needed to know about." The officer testified that he typically asks about weapons late at night and, also, "a lot of our vehicles that are gone through, people are stealing guns out of them or the people that are stealing the cars are armed, as well." Miller indicated he did not, and Dyson slightly shook his head. The officer then asked to pat them down to make sure there was "nothing big or nothing." Miller agreed to be patted down.

**{¶ 8}** After patting down Miller, Officer Reckner asked Dyson if he had anything on him; Dyson responded, "No, sir." However, when he was asked for consent to be patted

down, Dyson declined. When the officer asked why, Dyson responded that they had not done anything wrong and the officer had just stopped them walking home. Officer Reckner repeated that people were going through cars and "you're out walking." Dyson asked if that automatically made them a suspect, and Reckner responded, "yes, at 3:00 a.m. in the morning."

{¶ 9} Other officers had arrived while Officer Reckner and Dyson were talking. Officer Waller walked behind Dyson with a flashlight and informed Officer Reckner that Dyson had "a knife visible in his back pocket." When asked, Dyson confirmed that he had a knife. At that point, Reckner told Dyson that he was going to pat him down because he had a weapon on him. The officer asked Dyson if he had anything else on him before he (Reckner) found it. Dyson said no. Officer Reckner testified that when he went to pat down Dyson, Dyson mumbled under his breath that he had a gun. Upon patting him down, Officer Reckner found a Glock 43X in a holster and two pocketknives. After Dyson admitted that he did not have a license to carry a concealed weapon and was a convicted felon, Officer Reckner placed him under arrest. Approximately three minutes elapsed between the beginning of the encounter and when the gun was found.

{¶ 10} Dyson was indicted for having weapons while under disability, a felony of the third degree. He moved to suppress the evidence against him, claiming that Officer Reckner had not lawfully stopped and searched him. The trial court held a hearing on the motion on June 20, 2024, during which Officer Reckner testified and the State offered his body camera and cruiser videos as evidence.

{¶ 11} Both parties filed post-hearing memoranda. The State argued that the

interaction between Dyson and Officer Reckner was a consensual encounter, and thus Dyson's Fourth Amendment rights were not implicated.   Alternatively, the State claimed that even if it were an investigatory detention, the officer was permitted to detain him and complete a pat down for weapons under the totality of the circumstances.   Dyson, on the other hand, argued that the officer lacked reasonable articulable suspicion that he had engaged in criminal activity to justify stopping him.   To a lesser extent, Dyson asserted that nothing supported searching him.

{¶ 12} On July 29, 2024, the trial court granted the motion to suppress, finding that the pat down had not been justified under the totality of the circumstances.   The trial court reasoned:

In the present case, the Court finds that Officer Reckner's pat down of Defendant was not justified under the totality of the circumstances. Specifically, Officer Reckner testified that there had been no criminal activity either reported, or observed, at the location from which Defendant was departing, nor was there a suspicion of criminal activity at the location towards which Defendant was walking at the time of the stop.   Instead, Officer Reckner testified that he initiated the stop of Defendant and his friend because it was dark outside, and he could not determine their ages. The Court notes that Defendant provided identification to Officer Reckner, and Officer Reckner acknowledged during his testimony that Defendant did not violate any criminal statute, and neither Defendant, nor his friend, threatened Officer Reckner in any way.   Accordingly, the Court finds that,

although the initial stop of Defendant and his friend may have been lawful under *Terry*, the totality of the circumstances does not establish that there was any reason to believe that Defendant was armed and dangerous, or that a pat down was necessary to protect the safety of Officer Reckner, or anyone else, and the Court finds that evidence arising out of the illegal pat down must be suppressed.

{¶ 13} The State appeals from the trial court's judgment, raising one assignment of error. It claims that the trial court erred in sustaining Dyson's motion to suppress, because the totality of the circumstances established that Dyson was armed and that a pat down was necessary.

## II. Relevant Legal Standards

{¶ 14} An appeal from a ruling on a motion to suppress presents a mixed question of fact and law. *State v. Ojezua*, 2016-Ohio-2659, ¶ 15 (2d Dist.). When considering a motion to suppress, the trial court takes on the role of trier of fact and is in the best position to resolve factual questions and assess the credibility of witnesses. *State v. Turner*, 2015-Ohio-4612, ¶ 10 (2d Dist.). As a result, we must accept the trial court's findings of fact if they are supported by competent and credible evidence. *Id.*; *State v. Hale*, 2024-Ohio-4866, ¶ 12. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Turner* at ¶ 10, quoting *State v. Koon*, 2015-Ohio-1326, ¶ 13 (2d Dist.). The trial court's application of law to the findings of fact is subject to a de novo standard of review. *State v. Shepherd*, 2021-Ohio-4230, ¶ 10 (2d

Dist.).

{¶ 15} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1 (1968). "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Whether a stop and/or search is reasonable under the Fourth Amendment depends upon the particular facts and circumstances, viewed objectively by examining the totality of the circumstances. *See State v. Leak*, 2016-Ohio-154, ¶ 14.

{¶ 16} The law recognizes three types of police-citizen interactions: 1) a consensual encounter, 2) a brief investigatory stop or detention, and 3) an arrest. *State v. Weisgarber*, 2017-Ohio-8764, ¶ 15 (2d Dist.), citing *State v. Millerton*, 2015-Ohio-34, ¶ 20 (2d Dist.). In determining whether an individual engaged in a consensual encounter or was subject to an investigatory detention, the focus is on the police officer's conduct, not the subjective state of mind of the person stopped. *Weisgarber* at ¶ 18; *State v. Ramey*, 2016-Ohio-607, ¶ 25 (2d Dist.).

{¶ 17} Consensual encounters are not seizures, and the Fourth Amendment guarantees are not implicated in such an encounter. *State v. Taylor*, 106 Ohio App.3d 741, 747-749 (2d Dist. 1995), citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Consensual encounters occur when the police merely approach a person in a public place and engage the person in conversation, and the person remains free not to answer and to walk away. *State v. Lewis*, 2009-Ohio-158, ¶ 21 (2d Dist.), citing *Mendenhall* at 553. A consensual encounter stays consensual even if the officers ask questions, ask for identification, or search belongings, so long as they do not convey the

message that compliance is required. *State v. Jones*, 2021-Ohio-3050, ¶ 33 (2d Dist.). Police officers may not conduct a pat down for weapons during a consensual encounter absent consent by the person with whom they are interacting.

**{¶ 18}** As to investigatory detentions, police officers may briefly stop and/or temporarily detain individuals to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *Terry*, 392 U.S. 1; *State v. Mays*, 2008-Ohio-4539, ¶ 7-8. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2003-Ohio-1047, ¶ 14 (2d Dist.), quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." (Citation omitted.) *Kansas v. Glover*, 589 U.S. 376, 380 (2020).

**{¶ 19}** A person is subject to an investigatory detention when, in view of all the circumstances, a reasonable person would believe that he or she is not free to leave. *State v. Penwell*, 2021-Ohio-1216, ¶ 10. Factors that might indicate a person's interaction with officers is an investigatory detention (as opposed to a consensual encounter) include the "threatening presence of several police officers, the display of a weapon, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be required, approaching the

person in a nonpublic place, and blocking the [person]'s path." *State v. Cosby*, 2008-Ohio-3862, ¶ 13 (2d Dist.).

**{¶ 20}** "The authority to stop an individual does not necessarily equate to authority to search the individual." (Citations omitted.) *State v. Lovins*, 2010-Ohio-3916, ¶ 12 (2d Dist.). Once a lawful investigatory stop has been made, a police officer may conduct a limited protective search for concealed weapons only if the officer reasonably believes that the suspect may be armed and a danger to the officer or to others. *State v. Evans*, 67 Ohio St.3d 405, 408 (1993).

**{¶ 21}** "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *Evans* at 408, quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972). "In other words, 'the protective pat down under *Terry* is limited in scope to its protective purpose and cannot be employed by the searching officer to search for evidence of crime.' " *Millerton*, 2015-Ohio-34, at ¶ 26, quoting *State v. Holley*, 2004-Ohio-4264, ¶ 10 (2d Dist.). It must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 30.

**{¶ 22}** To justify a pat-down search, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. "The officer need not be absolutely certain that the individual is armed; rather, the issue is whether a reasonably prudent man in those circumstances would be warranted in the belief that his safety or the safety of others was in danger." *State v. Grefer*, 2014-Ohio-51, ¶ 24 (2d Dist.), citing

*State v. Andrews*, 57 Ohio St.3d at 89. The totality of the circumstances must "be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *Id.* at 87-88.

### III. Validity of the Stop and Pat Down of Dyson

{¶ 23} Although the State's assignment of error is directed to the trial court's conclusion that the pat-down for weapons was unlawful, its appellate brief also argues that Dyson was subject to a lawful investigatory detention, a prerequisite for a lawful *Terry* pat-down. In response, Dyson argues that Officer Reckner lacked reasonable suspicion to either conduct an investigatory detention or to pat him down for weapons. In light of the parties' briefing, we consider both issues to be before us.

#### A. Nature of the Encounter

{¶ 24} The record reflects that the interaction between Officer Reckner and Dyson began as a consensual encounter. The officer stepped out of his cruiser and approached Dyson and his friend, who were walking down Claybeck Drive. Officer Reckner called out to them and asked where they were going, but he did not do anything that compelled them to stop and talk to him. The encounter did not convert to an investigatory detention merely because the officer asked for their identification and questioned them about their activities.

{¶ 25} The tenor of the encounter changed as Dyson refused to consent to a patdown, Officer Reckner continued to hold onto their identifications, the officer told Dyson that he and Miller were suspects in the car break-ins, and additional officers arrived at the scene. Reckner testified that he believed that Dyson and his friend were subject

to an investigatory detention at this time. At the latest, the encounter changed from a consensual encounter to an investigatory detention when Officer Reckner patted down Dyson without his consent.

{¶ 26} Whether Officer Reckner could *lawfully* conduct a *Terry* pat-down for weapons depended on whether the officer had a reasonable suspicion of criminal activity to justify the investigatory detention. In this case, we need not reach this issue because, even if the officer had a reasonable suspicion of criminal activity to justify detaining Dyson, we conclude that he lacked a reasonable suspicion that he was armed and dangerous.

**B. Lawfulness of the Pat-Down for Weapons**

{¶ 27} The State argues that Officer Reckner had a reasonable suspicion that Dyson was armed and dangerous when he conducted the pat-down for weapons. The pat-down occurred after another officer had informed Officer Reckner that Dyson had a pocketknife in his back pocket and Dyson confirmed that he did. The State contends that, once the pocketknife was observed, "the officers had more than just suspicions, the officers knew he was armed." The State thus asserts that the officer had probable cause to detain Dyson and to pat him down for weapons, particularly since he had lied about being armed.

{¶ 28} In contrast, Dyson argues that his possession of a pocketknife did not justify the pat-down for weapons. He states, "Mere possession of a pocketknife does not create a suggestion that a person presents a safety risk to others. Pocketknives have a great many uses, the vast majority of which are utilitarian in nature, for this reason they are incredibly popular everyday tools. Conflating possession of a pocketknife with intent to

harm another, as Appellant asks this court to do, would create an incredibly concerning precedent." Dyson further points to Officer Reckner's testimony that he subjectively did not feel threatened by Dyson or Miller. Dyson directs us to *State v. Kinnison*, 2016-Ohio-3481 (2d Dist.), a case in which we found the officer's order for the defendant to empty his pockets violated the Fourth Amendment where the officer "was admittedly not concerned for his safety and was only interested in finding illegal narcotics."

{¶ 29} The parties have not directed us to any case law on whether the possession of a pocketknife creates a reasonable suspicion that a person is "armed and dangerous" to justify a pat-down for weapons. Some jurisdictions have held that the possession of a knife supported an officer's suspicion that a suspect possessed other weapons, which in turn justified the pat-down search. *E.g., People v. Brink*, 2023 WL 8818726, *2 (Cal. App. Dec. 21, 2023) (unreported); *Dobson v. State*, 737 So.2d 590, 592 (Fla.App.1999) ("a pocketknife with a two to three inch long blade can be a dangerous weapon for purposes of the stop and frisk law"). In *State v. Johnson*, 2003-Ohio-4177 (8th Dist.), the Eighth District concluded that, "once Johnson admitted he had a knife in his pocket, the police had the right to pat him down to determine whether the knife was a threat to their safety." *Id.* at ¶ 19. It is unclear whether the Eighth District believed that the presence of the knife justified a pat-down for additional weapons.

{¶ 30} On the other hand, some jurisdictions have concluded, as Dyson asserts, that possession of a pocketknife, alone, does not justify a *Terry* pat-down for weapons. As stated by the Court of Appeals for the District of Columbia,

People carry pocketknives for many reasons; anybody who has an

occasional need to open packages, break down boxes, or cut string may find it useful to keep one at hand. Pocketknives may be carried "for utilitarian reasons" or "as a tool in certain trades or hobbies." A pocketknife is often listed first among the "ten essentials" that older Scouts (formerly, "Boy Scouts") are expected to carry on any outing. In short, individuals are allowed to carry pocketknives . . . without forfeiting their Fourth Amendment rights to be free from seizures and searches absent more particularized suspicion.

(Citations omitted.) *Maye v. United States*, 260 A.3d 638, 648 (D.C. Cir. 2021). *See also Lockhard v. Maryland*, 247 Md.App. 90 (2020) (police lacked reasonable articulable suspicion that the defendant was armed and dangerous when there was no indicia other than Lockard's possession of a closed folding knife).

{¶ 31} On the record before us, we agree with the trial court that Officer Reckner's pat-down of Dyson violated the Fourth Amendment. Officer Reckner stopped Dyson and his friend to investigate car break-ins in the neighborhood. The officer acknowledged during his testimony that he had not observed Dyson violate any criminal statute or ordinance, and neither Dyson nor Miller were threatening in any way. The cruiser video substantiated that Dyson was cooperative and did not engage in suspicious behavior; Dyson's decision to deny consent to search did not create a reasonable suspicion that he was armed and dangerous. During the interaction, another officer informed Officer Reckner that Dyson had a knife in his back pocket. While an officer may reasonably ask that the pocketknife be placed elsewhere while the encounter continues, we agree with

the Court of Appeals for the District of Columbia that the presence of the pocketknife, alone, did not create a reasonable suspicion that Dyson was otherwise armed and dangerous. *Contrast State v. Smith*, 2019-Ohio-4370 (2d Dist.) (Smith's possession of a pocketknife, along with acting nervous and exhibiting danger clues, warranted pat-down to remove the knife).

{¶ 32} Reckner testified that he had asked Dyson and Miller if they had any weapons, and both denied it. However, Reckner's body camera video indicated that he asked if they had anything on them he needed to know about. The officer did not specifically ask about weapons, nor did his question suggest that he was concerned about items such as pocketknives. Although it is clear, with hindsight, that Dyson did lie and that he was carrying a firearm, Officer Reckner only knew that Dyson had a knife in his back pocket when he decided to pat down Dyson. In addition, Officer Reckner had not yet heard back from the dispatcher and was still unaware of Dyson's criminal record.

{¶ 33} Although Officer Reckner became aware that Dyson had a pocketknife in his back pocket, the officer was not justified in patting him down for weapons without additional indicia that Dyson was armed and dangerous to the officers or others. Accordingly, the trial court properly granted Dyson's motion to suppress.

{¶ 34} The State's assignment of error is overruled.

### IV. Conclusion

{¶ 35} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, J. concurs.

WELBAUM, J., dissents:

{¶ 36} I respectfully dissent from the portion of the majority's opinion that concludes Ofc. Reckner was not justified in conducting a pat-down search for weapons on Dyson. For the following reasons, I believe the pat-down search in question was lawfully conducted and that the trial court erred by holding otherwise.

{¶ 37} " 'Where a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others.' " *Evans*, 67 Ohio St.3d at 408-409, citing *State v. Bobo*, 37 Ohio St.3d 177 (1988), paragraph two of the syllabus. The totality of the circumstances must be considered "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *Andrews*, 57 Ohio St.3d 86, 87-88; *accord Smith*, 2019-Ohio-4370, at ¶ 34 (2d Dist.). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (Citations omitted.) *Terry*, 392 U.S. at 27; *accord State v. Martin*, 2004-Ohio-2738, ¶ 14 (2d Dist.); *State v. Tomlin*, 2024-Ohio-4710, ¶ 26 (2d Dist.). "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry* at 27, quoting *Brinegar v. United States*, 338 U.S. 160, 174-176 (1949).

{¶ 38} In this case, Ofc. Reckner testified that he observed Dyson walking with Miller around three in the morning in an area that was less than a five-minute walk or "a couple hundred yards" from the location where a homeowner had recently reported suspicious activity occurring and where the homeowner's vehicle had been rummaged through. Suppression Hearing Tr. (June 20, 2024), p. 8 and 20. Ofc. Reckner's testimony indicated that he was also aware that someone had tried to steal another vehicle just two blocks away. *Id.* at 7 and 9. In addition, Ofc. Reckner testified that: "A lot of our vehicles that are gone through, people are stealing guns out of them or the people that are stealing the cars are armed as well." *Id.* at 10. Ofc. Reckner further testified that Dyson looked "nervous" during their encounter and that Dyson was in possession of a pocketknife. *Id.* at 11 and 19. The body camera video admitted into evidence established that, despite Ofc. Reckner's asking Dyson if he had "anything he needed to know about," Dyson did not disclose the fact that he had a pocketknife on his person until the pocketknife was observed by Ofc. Waller. State's Exhibit 1.

{¶ 39} To support its conclusion that Ofc. Reckner was not justified in conducting a pat-down search on Dyson, the majority relies on nonbinding case law holding that the possession of a pocketknife *alone* does not justify a *Terry* pat-down search for weapons. *See Lockhard*, 247 Md.App. 90; *Maye*, 260 A.3d at 648 (D.C. Cir. 2021). However, regardless of the majority's reliance on that case law, the evidence in this case established that Ofc. Reckner's pat-down search was based on more than just Dyson's possession of the pocketknife. Indeed, the evidence also established that Dyson and Miller were out walking at an unusually late hour within close proximity to an area where

suspicious activity had been recently reported and where someone had been rummaging through and trying to steal vehicles. Those circumstances alone would have led a reasonable police officer to believe that Dyson and Miller may have been the individuals who were tampering with the vehicles, as Ofc. Reckner testified no one else was walking around the subject area during the unusual timeframe in question. Suppression Hearing Tr. (June 20, 2024), p. 9-10. Because Ofc. Reckner's testimony indicated that, in his experience, guns were often stolen out of vehicles that had been rummaged through and that people who steal vehicles were often armed, under the circumstances of this case, it was reasonable for Ofc. Reckner to believe that Dyson and Miller may have been armed.

{¶ 40} In addition, Ofc. Reckner observed Dyson acting nervously during their encounter. Ofc. Reckner was also made aware of the fact that Dyson was in possession of a pocketknife, a fact that Dyson did not disclose when Ofc. Reckner initially asked if he had anything on him that the officer should know about. As noted by the majority, the Eighth District Court of Appeals held that "once [the defendant] admitted he had a knife in his pocket, the police had the right to pat him down to determine whether the knife was a threat to their safety." *Johnson*, 2003-Ohio-4177, ¶ 19 (8th Dist.). *See also United States v. Mikulski*, 317 F.3d 1228, 1234-1235 (10th Cir. 2003) (a pat-down search was justified when a stopped driver informed the officer he had a knife in his belt).

{¶ 41} The majority also recognized that this court has previously held that a defendant's possession of a pocketknife, along with the defendant's acting nervously and exhibiting danger clues, warranted a pat-down search to remove the pocketknife. *See Smith*, 2019-Ohio-4370, at ¶ 35 (2d Dist.). *See also State v. Shern*, 2018-Ohio-5000,

¶ 34 (2d Dist.) (a pat-down search was justified where an officer observed two folding knives clipped to the defendant's pocket and where there was a suspicion of drug activity); *United States v. Wiley*, 493 Fed.Appx. 481, 482-483 (5th Cir.2012) (a pat-down search was justified under circumstances where an officer observed a pocketknife clipped to the defendant during a traffic stop conducted in a high-crime neighborhood). In this case, the presence of Dyson's pocketknife combined with Dyson's nervousness and the suspicion surrounding Dyson and Miller's being out at such a late hour in close proximity to an area where vehicles had been tampered with similarly warranted a pat-down search for weapons.

{¶ 42} It should also be noted that, at paragraph 28, the majority improperly considered the fact that Officer Reckner's testimony indicated that he subjectively did not feel threatened by Dyson or Miller. Such testimony was irrelevant to whether Ofc. Reckner had reasonable suspicion to believe that Dyson was armed. *See Evans,* 67 Ohio St.3d at 413. The Supreme Court of Ohio has explained that "whether the officer is in fear for his or her safety" is not "a critical factor in determining whether the officer had reasonable suspicion that the detainee was armed[.]" *Id.* In support of that notion, the Supreme Court cited the following language from *United States v. Tharpe*, 536 F.2d 1098, 1101 (5th Cir. 1976):

"We know of no legal requirement that a policeman must feel 'scared' by the threat of danger. Evidence that the officer was aware of sufficient specific facts as would suggest he was in danger satisfies the constitutional requirement. *Terry* cannot be read to condemn a pat-down search because

it was made by an inarticulate policeman whose inartful courtroom testimony is embellished with assertions of bravado, so long as it is clear that he was aware of specific facts which would warrant a reasonable person to believe he was in danger. Under the familiar standard of the reasonable prudent man, no purpose related to the protective function of the *Terry* rule would be served by insisting on the retrospective incantation 'I was scared.' "

*Evans* at 413, quoting *Tharpe* at 1011, *overruled on other grounds*, *United States v. Causey,* 834 F.2d 1179 (5th Cir. 1987).

{¶ 43} Based on the totality of the circumstances in this case, and based on Ofc. Reckner's testimony indicating that, in his experience, guns were often stolen from vehicles that had been rummaged through and that people who stole vehicles were often armed, I believe Ofc. Recker had reasonable suspicion to believe that Dyson may have been armed and dangerous so as to warrant a pat-down search for weapons. Because Dyson and Miller were out walking at an unusually late hour in close proximity to an area where suspicious activity had been recently reported and where someone had been rummaging through and attempting to steal vehicles, I believe Ofc. Reckner had reasonable suspicion to believe that Dyson and Miller may have been the individuals tampering with the vehicles, and thus reasonable suspicion to believe that Dyson and Miller may have been armed. That reasonable suspicion was further supported by the fact that Ofc. Reckner believed Dyson was acting nervously during their encounter and that Ofc. Reckner was aware that Dyson was in possession of a pocketknife that Dyson

did not initially disclose.

{¶ 44} For all the foregoing reasons, I would sustain the State's assignment of error and reverse the trial court's judgment granting Dyson's motion to suppress. Therefore, I respectfully dissent from the portion of the majority's opinion holding otherwise.